**United States District Court**
**Eastern District of Massachusetts**

| | |
|---|---|
| **Robert David Beckley** ) | |
| **\*Plaintiff** ) | |
| ) | |
| ) | |
| **v.** ) | |
| ) | |
| ) | |
| ) | |
| **City of Boston** ) | **Civil Action** |
| **Boston Mayor Thomas Menino,** ) | No._____ |
| **In his official and individual capacities,** ) | |
| **Boston Police Department, City of Boston,** ) | **Civil** |
| **Past Massachusetts police Commissioner Paul Evans,** ) | **Complaint** |
| **Present Massachusetts police Commissioner Kathleen O'Toole,** ) | |
| **In her official and individual capacities, Boston** ) | **\*Jury trial demanded on** |
| **Police officer Joseph King in his official and individual capacities.** ) | **all counts** |
| **John Does** ) | |
| **\*Defendants** ) | |

<u>Introduction</u>

Robert Beckley ("Plaintiff") of North Carolina 1414 Village Crossing, Chapel Hill, NC 27517 here by

asserts the following claims against the defendants in the above entitled action:

(1) Violation of 42 U.S.C. 1983 cruel and unusual punishment.

(2) Violation of 42 U.S.C. 1983 excessive use of force.

(3) Violation of 42 U.S.C. 1983 unwarranted search and seizure.

(4) Violation of 42 U.S.C. 1983 refusing of refusing of neglecting to prevent.

(5) Violation of Mass Civil Rights Act (M.G.L. C.12 sec. 111).

(6) Assault

(7) Battery

(8) Intentional infliction of emotional distress.

(9) Violation of 42 U.S.C.§ 14141: Police misconduct

(10) Reserved for negligence (until 6 months after presentment)

<u>Jurisdiction</u>

1.  Jurisdiction of this court arises under 28 U.S.C. Sections 1332, 1337, 1343 (a), and 1367 (a); 42 U.S.C. SECS 1983, and U.S.C. 1961-1968; 42 U.S.C. § 14141.

2.  Jurisdiction Of this court for the pendent claims is authorized by F.R. CfV.P.18 (a), and arises under the doctrine of pendant jurisdiction as set forth in United Mine Workers v. Gibbs, 383 U.S. 715 (1966).

<u>Parties</u>

3.  Plaintiff Robert David Beckley ("Plaintiff") is a prisoner at FCI Fairton, Fairton NJ, U.S.A. 02114. The Plaintiff is a natural person and was a resident of North Carolina during all relevant times of this action. The Plaintiff's mailing address for all correspondence is his mother's address 277 Concord Rd., Bedford MA 01730 U.S.A. Plaintiff will be returning to Chapel Hill, NC after upon release from Federal prison.

4.  Defendant City of Boston is a Municipal Corporation, organized under the laws of the Commonwealth of Massachusetts. It is responsible for the policies, procedures, and practices implemented through its various agencies, agents, departments, and employees, and for injury occasioned thereby. It was also the public employer of defendants Mayor Thomas Menino, Boston Police past Commissioner Paul Evans (whereabouts unknown) and Kathleen O'Toole Kathleen O'Toole who is presently the Boston Police Commissioner, and police officer Joseph King at all times relevant to this complaint.

5.  Defendant Boston Mayor Thomas Menino is and was the elected Mayor of the City of Boston, Massachusetts U.S.A. at all times relevant to this complaint. He is and was the Chief Executive of the City of Boston, Massachusetts at all time relevant to this complaint. He is and has been responsible for all the City of Boston's agencies, agents, departments, and employees, and for injuries occasioned thereby.

6.  Defendant the Boston Police Department is a department of the City of Boston, Massachusetts U.S.A. It is responsible for the policies, procedures and practices implemented through its police force and for injury occasioned thereby. It is the

department within the City of Boston which employed defendant Joseph King Boston police officer at all times relevant to this complaint and defendants Boston Police past Commissioner Paul Evans (and Kathleen O'Toole Kathleen O'Toole who is presently the Boston Police Commissioner.

7.  Defendant Kathleen O'Toole, the appointed Boston Police Commissioner of Boston Massachusetts is responsible for the promulgation and implementation of police procedures, and practices in the City of Boston. She is responsible for the <u>Police Academy</u>. Commissioner O'Toole is also an employee of the City of Boston.

8.  Defendants Paul Evans, (whereabouts unknown) was the past Boston Police Commissioner of Boston Massachusetts was responsible for the promulgation and implementation of police procedures, and practices in the City of Boston. He was also responsible for the <u>Police Academy</u>. Commissioner Evans was also an employee of the City of Boston.

9.  Defendant Boston police officer Joseph King is a natural person and a duly appointed police officer in the Boston Police Department and an employee of the City of Boston at all times relevant to this complaint.

10. Defendant John Doe, and others not presently known to the Plaintiff we at all times material to this complaint duly-appointed City of Boston police officers of unknown rank, and supervisors of defendant Boston Police officer Joseph King and employees of the city of Boston.

11. Plaintiff sues all public employees in their official and individual capacities.

12. At all times material to this complaint, defendants officer Joseph King, Boston Mayor Thomas Menino, past Commissioner Paul Evans and Kathleen O'Toole who is presently the Boston Police Commissioner, John Does toward Plaintiff under color of the statutes, ordinances, customs and usage of the state of Massachusetts, United States of America, City of Boston, and the Boston Police Department.

13. On May 10th, 2002, at approximately 9 PM, on Boylston Street near the intersection of Dartmouth Street in Boston Massachusetts. The plaintiff who was sitting in the drivers

seat of a Buick Rendezvous, which was not moving when he was shot in the head by the defendant Joseph King, an on duty police officer, employed by the Boston Police Department and the City of Boston apparently in an attempt o apprehend the plaintiff.

14. The defendant, Joseph King was standing approximately 10 to 15 feet away from the plaintiffs motor vehicle which was not moving at the time the shooting took place.

15. The defendant, Joseph King standing almost directly to the right of the plaintiff, and approximately 10-15 feet away from the passengers side of the motor vehicle.

16. The plaintiff was unarmed.

17. The defendant, Joseph King did not verbally or otherwise warns the plaintiff prior to discharging his department issued 40 caliber Glock hand gun.

18. The plaintiff was not an imminent threat to the personal safety of the defendant Joseph King at the time of the shooting.

19. There were many people in the area at the time of the shooting.

20. Some of the bullets fired by the defendant Joseph King nearly hit numerous people in the area.

21. When the defendant Joseph King fired his gun, he appeared to be standing in a "shooting position".

22. There are witnesses that can and will testify to the fact that at the time of the shooting, the plaintiff's motor vehicle was stopped and that the plaintiff was not in imminent threat to the defendant Joseph King or any other pedestrians (see attached witness interview David Anderson exhibit 1).

23. There are witnesses that can and will testify to the fact that the defendant Joseph King not only endangered the life and safety of the plaintiff, but numerous pedestrians.

24. In <u>Tennessee v. Garner</u> (1985) the U.S. Supreme Court ruled that police shootings under the authority of laws and policies that allowed officers to use deadly force to apprehend fleeing unarmed suspects violated the Fourth Amendment of the U.S. Constitution which protect search and seizure.

25. The Boston Police Department revised their policy on the use of deadly force within a few months after this shooting.

26. The plaintiff was transported to Massachusetts General Hospital for treatment following the shooting. The hospital is located in Boston, Massachusetts. (See attached medical record exhibit 2).

27. The plaintiff has received subsequent medical care due to injuries and impairments at numerous medical facilities.

28. The plaintiff suffered numerous physical, psychological, and neurological injuries and impairments as a result of being shot in the head by defendant Joseph King.

29. Some of the plaintiff's injuries and impairments are of a permanent nature.

30. Some of the injuries and impairments suffered by the plaintiff affect him every day.

31. Some of the injuries and impairments suffered by the plaintiff affect his ability to work. Plaintiff had difficulty in performing his duties upon returning to work as a direct result of the conduct of defendant Joseph King resulting in astronomical loss of person income and company revenue and there is a high probability of likelihood that the plaintiff will have to receive disability benefits resulting in a substantial loss of income.

32. These injuries and impairments suffered by the plaintiff include, but are not limited to: Post traumatic stress disorder, visual impairment, constant headaches, partial hearing loss in right ear, a continues hand tremor in both hands, dizzy spells, frequent loss of balance, continuous pain from the bullet fragments that remain embedded in the plaintiffs head. A very large unsightly ugly scar, and various other physical, neurological, and psychological injuries and impairments.

33. The plaintiff has previously worked in the film industry. The scar the plaintiff suffered may hinder his ability to obtain future jobs.

34. The plaintiff has incurred substantial legal and medical bills due to this incident.

35. The plaintiff will have to pay for counseling, medication, and other various future medical expenses due to the shooting.

36. The defendant Joseph King's actions constitute deliberate indifference in using excessive force amounting to cruel and unusual punishment against the plaintiff pursuant to the Eight amendment of the United States Constitution, and violated the plaintiff's Fourth Amendment United States Constitution rights against unwarranted search and seizure in violation of 42 U.S.C.§1983.

37. Plaintiff removed a piece of the bullet on December 17, 2003 from his head. This was just of the fragments of the bullet that were left in his head. It caused acute and continues to cause physical pain. (See exhibit 3)

## Count 1: Violation of 42 U.S.C. 1983: Cruel and unusual Punishment

38. Plaintiff repeats and re-alleges and incorporates by reference the allegations in paragraphs 1 through 37above with the same force as if herein set forth.

39. Acting under the color of law, defendants worked a denial of the plaintiff's rights, privileges, or immunities secured by the United States Constitution by the privileges, or immunities secured by the United States Constitution or by Federal law [1] to wit.

   (a) By defendant officer Joseph king shooting at plaintiff multiple times amounting to cruel and unusual punishment.

   (b) By defendant officer Joseph King shooting the plaintiff in the back of the head amounting to cruel and unusual punishment.

   (c) By refusing or neglecting to prevent such deprivations and denial to plaintiff of his rights, privileges, and immunities against cruel and unusual punishment as guaranteed by the Constitution of the United States.

40. The plaintiff incorporates exhibits 1,2, and 3 into this complaint by reference as if set forth herein.

41. Plaintiff did nothing to warrant defendant officer Joseph Kings intentional lethal use of a firearm/deadly force and was sitting in a non moving motor vehicle when the shooting occurred (see exhibit 1)

---

[1] Sato v. Flores, 103 F. 3d 1056,1061 (1ˢᵗ circuit 1997); McNamara v. Honeyman, 406 Mass. 43, 52 (1989)

42. No complaint, information, or indictment was ever sworn against plaintiff alleging offenses occurring prior to the moment defendant officer Joseph King shot at the plaintiff in the head.

43. Defendant City of Boston, Boston Police Department, Mayor Thomas Menino, and the past Commissioner Paul Evans and Kathleen O'Toole who is presently the Boston Police Commissioner, John Does negligently trained Defendant Officer Joseph King.

44. As a result of the defendants extreme and outrageous conduct plaintiff has suffered numerous physical, psychological, and neurological harm including pain and anguish, severe emotional trauma, embarrassment, humiliation, hearing loss, vision loss, possible brain damage, and various other serious impairments.

45. Defendants City of Boston, Boston Police Department, Boston Mayor Thomas Menino, past Commissioner Paul Evans and Kathleen O'Toole who is presently the Boston Police Commissioner, John Does who were and/or are supervisors of defendant officer Joseph King are also liable under the doctrine of respondeat superior.

46. As a result of the concerted unlawful and malicious intentional discharging of a firearm and shooting by defendant Boston Police officer Joseph King of the plaintiff, the plaintiff was deprived of his United States Constitutional rights against cruel and unusual punishment in violation of the 8th Amendment of the U.S. Constitution and 42 U.S.C. 1983.

Wherefore, plaintiff demands judgment for the cruel and unusual punishment against all the defendants, jointly and severally, for actual, general, special, and compensatory damages in the amount of $5,000,000, and further demands judgment against each of said defendants, jointly and severally for punitive damages [2] in the amount deemed at time of trial to be just, fail, and appropriate, plus the cost of the action, including attorney's fees, and such other relief deemed to be just and equitable

---

[2] "Punitive damage are recoverable in sec. 1983 suit where defendant's conduct is motivated by un evil motive, intent, or where it involver reckless or callous indifference to plaintiff's Federally protected rights, Smith v. Wade 461.U.S. 30,50-51(1983); Clark v. Tuylor, 71 0 F.2d 4, 14 (1st circuit 1983) miga, supra at 355

**Count 2: Violation of 42 U.S.C. 1983: Excessive use of force**

47. Plaintiff repeats and re-alleges and incorporates by reference the allegations in paragraphs 1 through 46 above with the same force and effect as if herein set forth and exhibits 1,2 and 3.

48. At all times relevant here in, the conduct of all defendants were subject to 42 U.S.C. 1983.

49. As a result of his concerted, unlawful use of excessive force defendant officer Joseph King deprived plaintiffs rights to liberty, excessive punishment, and due process as guaranteed by the 4th, 5th, 6th, 8th, and 14 of the U.S. Constitution and 42 U.S.C. 1983 in violation of 42 U.S.C. 1983 and the said amendments of the said amendments of the U.S. Constitution.

50. Defendants City of Boston, Boston Police Department, Boston Police past and present Commissioners Paul Evans, Kathleen O'Toole, John Does who were/are supportive of Joseph King are also libel under the doctrine of respondeat superior. Wherefore, plaintiff demands judgment against all the defendants joint and severally, for actual, general, special, compensatory damages in the amount of $5,000,000, and further demands judgment against each of said defendants, joint and severally, for punitive damages in the amount to be determined at the time of trial to be just, fair, and appropriate, plus the cost of this action, including attorney's fees, and such other relief deemed to be just and equitable.

**Count 3: Violation of 42 U.S.C. 1983: unwarranted search and seizure**

51. Plaintiff repeats and re-alleges and incorporates by reference the allegations in paragraphs 1 through 50 and exhibits 1, 2 and 3 with the same force and effect as if herein set forth.

52. In 1985, The U.S. Supreme Court in Tennessee v. Garner held that police shootings under the authority of laws and policies that allowed officers to use deadly force to apprehend unarmed fleeing suspects violated the Fourth Amendment of the U.S. Constitution which protects against unwarranted search and seizures.

53. The plaintiff was unarmed.

54. As a result of his shooting the plaintiff, defendant police officer Joseph King deprived the plaintiffs guaranteed rights against unwarranted search and seizure as guaranteed by the fourth amendment of United States Constitution and 42 U.S.C. 1983.

55. Defendants City of Boston, Boston Police Department, Boston Mayor Thomas Menino, past and present Police Commissioners Paul Evans, Kathleen O'Toole, and John Does, and who were/are supervisors of defendant officer Joseph King are liable under doctrine of respondeat superior. Wherefore, plaintiff demands judgment against all the defendants, joint severally for actual, general, special, and compensatory damages in the amount of $5,000,000, and further demands judgment against each of said defendants, joint and severally for punitive damages in the amount to be determined at the time of trial to be just, fair, and appropriate, plus the costs of this action, including attorney's fees, and such other relief deemed to be just and fair.

**Count 4: 42 U.S.C. 1983: Refusing or neglecting to prevent.**

56. Plaintiff repeats and re-alleges and incorporates by reference the allegations in incorporates by reference the allegations in paragraphs 1-55 above and exhibits 1, 2 and 3 with the same force and effect as if herein set forth.

57. At all times relevant to this complaint, defendant officer Joseph King as a police officer of the Boston Police Department were acting under the direction and control of Defendants Boston Mayor Thomas Menino, City of Boston, Boston Police Department, and John Does.

58. Acting under the color of law and pursuant to official policy or custom defendants City of Boston, Boston Police Department, Boston Mayor Thomas Menino, John Does knowingly recklessly, or with gross negligence failed to instruct, supervise, control, and discipline on a continuing basis defendant police officers in their duties to refrain from:

(a) Conspiring to violate the rights privileges, and immunities guaranteed to plaintiff by the U.S. Constitution, laws of the U.S., and the laws of the Commonwealth of Massachusetts.

(b) Otherwise depriving plaintiff of his constitutional and statutory rights, privileges, and immunities.

59. Defendants City of Boston, Boston Police Department, Mayor Thomas Menino, John Does had knowledge or, had they diligently exercised that duties to instruct, supervise, control, and discipline on a continuing basis, should have had knowledge of the wrongs that would result, as heretofore alleged were about to be committed. Defendants City of Boston, Boston Police Department, Mayor Thomas Menino, John Does had power to prevent or aid in preventing the commission of said wrongs, could have done so by reasonable diligence, and knowingly, recklessly, or with gross negligence failed or refused to do so.

60. Defendants City of Boston, Boston Police Department, Boston Mayor Thomas Menino, John Does directly or indirectly, under color of law, approved or ratified the unlawful, deliberate, malicious, reckless, and wanton conduct of defendant police officers heretofore described.

61. The Boston Police Department changed its policy on the use of deadly for within months after the defendant Joseph King shot the plaintiff.

62. Had the new policy been in effect at the time of the shooting in this case, the shooting probably would not have taken place.

63. Defendants City of Boston Police Department, Boston Mayor Thomas Menino, Boston Past Police Commissioner Paul Evans and present Police Commissioner Kathleen O'Toole, John Does who were/are supervisors of defendant of defendant officer Joseph King are liable under the doctrine of responeat superior.

64. As a direct and proximate cause of the negligent and intentional acts of defendants City of Boston, Boston Police Department, and Boston Mayor Thomas Menino as set forth in paragraphs 57 through 63 above, Plaintiff suffered serious physical, psychological, and

neurological injuries and severe mental anguish in connection with the deprivation of his

constitutional and statutory rights guaranteed by the fifth, and fourteenth Amendments of

the Constitution of the United States and protected by 42 U.S.C. 1983.

Wherefore, plaintiff demands judgment against all of the defendants, jointly and

severally, for actual, general, special, and compensatory damages in the amount of

$5,000,000 and further demands judgment against each of the said defendants, jointly and

severally, for punitive damages in the amount to be determined at the time of trial to be

just, fair, and appropriate, plus the costs of this action including attorney's fees, and such

other relief deemed to be just and fair.

## Count 5: Violation of Mass. Civil Rights Act. M.G.L. c. 12 sec. 11H

65. Plaintiff repeats, re-alleges, and incorporates by reference the allegations in paragraph 1
through 64 above and exhibits 1, 2 and 3 with the same force and effect as if herein set
forth.

66. At all times relevant herein, the conducts of all defendants were subject to the
Massachusetts Civil Rights Act.

67. Defendant Boston police officer Joseph King interfered with or attempted to interfere by
threats,[3] multiple intentional discharges of (intimidation) a firearm, and injuring the
plaintiff with plaintiff's exercise and enjoyments of his rights- e.g. his rights to his
liberty, to be free of cruel and unusual punishment, and due process - secured by the
State and Federal Constitutions or laws of the U.S.A. or the Commonwealth of
Massachusetts[4].

68. Thus, under color of state, the plaintiff's liberty was threatened, and he was intimidated.

---

[3] "Under the MCRA", a 'threat'.... involves the intentional exertion of pressure to make another fearful or apprehensive of injury or
harm 'intimidation' involvers putting in fear for the purpose of compelling or deterring conduct.... Sarvis v. Boston Safe deposit &
Trust Co. .47 Mass.APP.CT 86 (1999) a noting Planned Parenthood League of Mass. Inc. v. Blake, 417 Mass. 467, cert. denied 513
U.S. 868 (1994). There must also be evidence of "actual or potential physical confrontations involving a threat of harm." Id. At 473
n.8, through the confrontation may involve third persons and the threat of harm need not be directed at the plaintiff. See Redgrave v.
Boston Symphony Orchestra, 399 MASS. At 100-101 (potential physical harm to audience and orchestra members by third persons
protesting plaintiff's political views is a confrontation within the MCRA) a plaintiff is not required to prove a specific intent to
threaten intimidate or coerce for the purpose of interfering with a secured right. Id at 99-100.
[4] Rogan  v. Menino, 973 F. supp 72, 77 (D. Mass. 1997)

69. Defendants, City of Boston, Boston Police Department, past Boston Police
    Commissioner Paul Evans, present Boston Police Commissioner Kathleen O'Toole, John
    Does who were/are supervisors of defendant police officer Joseph King are liable under
    the doctrine of respondeat superior.

70. As a direct and proximate result of the conduct of the defendants, the plaintiff was
    threatened, intimidated, and put in continuing anxiety, and extreme emotional distress
    and has suffered damages including but not limited to the aforesaid damages.
    Wherefore, the plaintiff demands judgment against defendants for injunctive relief, and
    actual, special, and compensatory damages, jointly and severally, in the amount of
    $5,000,000 and further demands judgment against each of the said defendants, jointly and
    severally, for punitive damage4s in the amount to be determined at the time of trial to be
    just, fair, and appropriate plus the costs of this action including attorney fees, as such
    other relief deemed to be just and fair.

**Count 6: assault**

71. Plaintiff repeats and re-alleges and incorporates by reference the allegations in paragraph
    1 through 70 above and exhibits 1, 2 and 3 with the same force and effect as if herein set
    forth.

72. Plaintiff is a reasonable person.

73. Defendant Boston police officer Joseph King intentionally created an apprehension of
    immediate physical harm by means of use of deadly force, to wit, intentionally
    discharging a firearm multiple times for no know purpose other than to create in the
    plaintiff an apprehension of immediate physical harm.[5]

74. Any reasonable person would also become apprehensive in the face of defendants
    brutally threatening conduct.

75. Defendants, City of Boston, Boston Police Department, Boston Mayor Thomas Menino,
    Boston Police Commissioner past Paul Evans and present Boston Police Commissioner

---

[5] Nolan v. Sartorio, 37 M.P.S. Torts, sec 12, p. 6 (2d 1989 and 1993) supp.1) Restatement (second) Torts, sec. 21.

Kathleen O'Toole, John Does who were/are defendant officer King's supervisors are liable under the doctrine of respondeat superior.

Wherefore the plaintiff demands judgment against all defendants, jointly and severally, for injunctive relief and actual, special, and compensatory damages in an amount deemed at time of trial to be just, fair and appropriate.

## Count 7: battery

76. Plaintiff repeats and re-alleges and incorporates by reference the allegations in paragraphs 1-75 above and exhibits 1, 2 and 3 with the same force and effect as if herein set forth.

77. Without the consent of the plaintiff, defendant officer Joseph King touched the plaintiff by shooting him in the head[6] causing serious injuries.

78. Defendants, City of Boston, Boston Police Department, Boston Mayor Thomas Menino, Boston Police Commissioner past Paul Evans and present Boston Police Commissioner Kathleen O'Toole, John Does who were/are defendant officer King's supervisors are liable under the doctrine of respondeat superior.

Wherefore the plaintiff demands judgment against all defendants, jointly and severally, for injunctive relief and actual, special, and compensatory damages in an amount deemed at time of trial to be just, fair and appropriate.

## Count 8: Intentional infliction of emotional distress.

79. Plaintiff repeats and re-alleges and incorporates by reference the allegations in paragraphs 1 through 78 above with the same force and exhibits 1, 2 and 3 with the same force and effect as if herein set forth.

80. Defendants intentionally and deliberately inflicted emotional distress on the plaintiff by intentionally and unlawfully discharging a firearm aimed directly at the plaintiff, abusing a lawful process by un lawful purpose, or by violating plaintiff's constitutional rights, or by interfering with plaintiffs state civil rights by threats, and/or by threats, and/or intimidation, or knew that emotional distress was the likely result of their conduct.

---

[6] Waters v. Blackshear, 412 Mass. 589, 590-591 (1992)

81. Defendant's conduct was extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community.

82. The actions of the defendants were and are the cause of plaintiff's distress.

83. The emotional distress sustained by plaintiff was severe and of a nature that no reasonable man could be expected to endure.[7]

84. As a result of defendants' extreme and outrageous conduct, plaintiff was, is and with a high degree of likelihood will continue to be emotionally distressed due to the intentional exclusion.[8]

85. Defendants, City of Boston, Boston Police Department, Boston Mayor Thomas Menino, Boston Police Commissioner past Paul Evans and present Boston Police Commissioner Kathleen O'Toole, John Does who were/are defendant officer King's supervisors are liable under the doctrine of respondeat superior.

86. As a result of the defendants' extreme and outrageous conduct, plaintiff has suffered and will continue to suffer mental pain and anguish, severe emotional trauma, embarrassment, and humiliation.

    Wherefore plaintiff demands judgment including interest, jointly and severally, for actual, general, special, and compensatory damages against all defendants to the amount $5,000,000.

## Count 9: Violation of 42 U.S.C. § 14141: Police misconduct

87. Plaintiff repeats, re-allegations in paragraphs 1 through 86 above with the same force and exhibits 1, 2 and 3 with the same force and effect as if herein set forth.

88. Defendant officer Joseph King in violation of 42 U.S.C.§14141 unlawfully intentionally discharged his firearm multiple times and shot the plaintiff in the head.

89. This was a clear case of misconduct.

90. The plaintiff was unarmed, and in a stopped motor vehicle when he was shot (See Exhibit1).

---

[7] Agis v. Howard Johnson Co, 371 MASS. 140, 145, (1976)

[8] "Extreme and outrages conduct" is not required if the emotional distress resulted from the commission of another tort. American Velodur Metal, Inc. v. Schinabek.20 Mass. App.ct.460, 470-471 ((1985)

91. The plaintiff posed no imminent threat of danger when defendant officer Joseph King discharged his firearm. (See exhibit 1)

92. The use of the firearm in this matter by defendant officer Joseph King would be considered police misconduct. Less extreme means were available.[9]

93. As a result of their police misconduct, defendants officer Joseph King deprive plaintiff's right to liberty, freedom against cruel and unusual punishment, state civil rights, in violation of fourth, fifth, sixth, eighth, and fourteenth amendments of the U.S. Constitution, 42 U.S.C.§1983, and 42 U.S.C.§14141.

94. Defendants, City of Boston, Boston Police Department, Boston Mayor Thomas Menino, Boston Police Commissioner past Paul Evans and present Boston Police Commissioner Kathleen O'Toole, John Does who were/are defendant officer King's supervisors are liable under the doctrine of respondeat superior.

Wherefore, plaintiff demands judgment against all defendant's jointly and severally, for actual, general, special, compensatory damages in the amount of $5,000,000 and further demand judgment of said defendants, jointly and severally, for punitive damages in the amount deemed at time of trial to be fair, just, and appropriate plus the costs the costs of this action, including attorney fees, and such other relief deemed to be just and equitable.

**Count 10: Reserved for negligence (until 6 months after presentment)**

95. Plaintiff repeats, re-alleges, and incorporates by reference the allegations in Paragraph 1 through 94 above and exhibits 1, 2, and 3 with the same force and effect as if here in set forth.

96. Defendants City of Boston, Boston Mayor Thomas Menino, Boston Police Department, John Does owed a duty to supervise or train the officers and to take steps to prevent events such as occurred here, to wit, the unlawful intention discharging of a firearm.

---

[9] According to international human rights standards. "Law enforcement officials shall not use firearms except in self defense or defense of others against the imminent threat of death or serious injury, to prevent perpetration of a particularly serious crime involving grave threat to life, to arrest a person presenting such a danger and resisting their authority, or to prevent his or her escape, and only when less extreme means are insufficient to achieve those objections. In any event, intentional lethal use of firearms may only be made when strictly unavoidable to protect life." Principal 9, basic principals on the use of force and firearms by law enforcement officials, UN Doc. Alconf.144/28/Rev. 1(1990)

97. In the months following this policy, the Boston Police Department changed their policy n the use of deadly force.

98. Had the defendants previously implemented this policy, it is likely the shooting would never have taken place.

99. Defendant officer Joseph King owed a duty to act according to the standard of ordinary care of a police officer, to wit. Whereas the plaintiff was not in immanent threat at the time of the shooting, the officer should have used less extreme actions, the failure of which was the proximate cause of plaintiff's injury.

100. Defendants City of Boston, Boston Police Department, Boston Mayor Thomas Menino, past Commissioner Paul Evans, Kathleen O'Toole who is presently the Boston Police Commissioner, and John Does breached their duty by failing to act as ordinary officials would act, to wit, by failing to perform their duties, and by falling adequately to control and to supervise his officers.

101. As a result of these breaches, which were the proximate causes of plaintiff's injuries, plaintiff suffered harm and damages.

102. Defendants City of Boston Police Department, Boston Mayor Thomas Menino, Boston Past Police Commissioner Paul Evans and present Police Commissioner Kathleen O'Toole, John Does who were/are supervisors of defendant of defendant officer Joseph King are liable under the doctrine of responeat superior.

Wherefore the plaintiff demands judgments against all the defendants, jointly and severally, for injunctive relief, and actual, special, compensatory, and punitive damages attorney's fees, cost, expenses, and interest in an amount deemed fair, just and appropriate at the time of trial.

## Count 11: Reservered for negligent infiliction of emotional distress until 6 months after presentation

103. Plaintiff repeats, re-alleges, and incorporates by reference the allegations in paragraphs 1 through 102 above with the same force and exhibits 1, 2 and 3 with the same force and effect as if herein set forth.

104. Defendants negligently inflicted emotional distress on the plaintiff.

105. Defendants had an affirmative duty to perform their professional services in such a manner as not to inflict emotion distress on the plaintiff.

106. Defendants breached their duties to the plaintiff.

107. The plaintiff never interfered with the defendants' obligation under the above-described duties.

108. The plaintiff suffered not only physical symptoms, but also as a consequence of the physical injury, mentally by defendants' breach of duty.

109. Defendants, City of Boston, Boston Police Department, Boston Mayor Thomas Menino, Boston Police Commissioner past Paul Evans and present Boston Police Commissioner Kathleen O'Toole, John Does who were/are defendant officer King's supervisors are liable under the doctrine of respondeat superior.

110. As a result of the defendants' negligent conduct, plaintiff has suffered from and will continue to suffer physical symptoms, pain, anguish, severe emotional trauma, embarrassment, and humiliation.

Wherefore, the plaintiff demands judgment, including interest, jointly and severally, against all the defendants for actual, general, special, compensatory, and punitive damages, in al amount deemed at trial to be just fair and appropriate plus attorney's fees, And the cost of this proceeds and interest and such other relief deemed to be just and equitable.

* Plaintiff demands jury trial on all counts and claims.

Respectfully submitted

Robert David Beckley, PRO SE

Send all correspondence to mailing
Address: Robert David Beckley, Pro Se
              277 Concord Rd.
              Bedford, MA 01730

Exhibit #1

RE: COMM. OF MASS                           MAY 11, 2002, 3:10 A.M.
RE: JOSEPH KING                             BPD DISTRICT 4
SPECIAL : 5/10/02

(PLEASE NOTE: .....dots indicate transcriber could not get what was said.)

Conducting this interview is Sgt. Det. James Wyse of the Boston Police Homicide
Unit. Also present is Det. Thomas Connolly of the Boston Police Department
District 4.

## STATEMENT OF DAVID ANDERSON

Q.   Today is Saturday, May 11, the year 2002. The time now is approximately

     3:10 a.m. And we are presently conducting an interview with Mr. David

     Anderson at District 4. Conducting this interview is myself, Sgt. Det. James J.

     Wyse of the Boston Police Homicide Unit and Det. Thomas Connolly assigned

     to District 4. This interview is relative to a police involved shooting that

     occurred on May 10, the year 2002. At approximately 9:45 p.m. in the vicinity

     of Boylston Street and Dartmouth Street. Sir for the record could you kindly

     state your name and spell your last name.

A.   My name is David Anderson. A-N-D-E-R-S-O-N.

Q.   And what is your address sir?

A.   My address is 12 Townsend Place, Syosset, New York.

Q    And how do you spell Syosset?

A.   S-Y-O-S-S-E-T

Q    And that's in New York. Sir earlier this evening did we speak with you relative

     to this incident. Ah police involved shooting?

A.   Yes.

2

Q. All right. And again we're gonna go over that one more time. Earlier this evening on Friday night, were you, did you happen to be in the vicinity of Boylston Street and Dartmouth Street?

A. Yes.

Q. And while you were there did anything attract your attention to look around the area?

A. Yes. I had noticed that there was police activity and I was curious to see what was going on.

Q. Okay and who were you in the area with?

A. I was with my girlfriend Margaret Lamb.

Q. Margaret Lamb?

A. Yes.

Q. L-A-M-B?

A. L-A-M-B.

Q. And is Margaret also from New York?

A. Yes.

Q. Now what part of New York she from?

A. She's also from Syosset.

Q. Sir while you and Miss Lamb were in this area what if anything unusual occurred?

A. As we watched the intersection a police officer walked around the intersection and then a ahm a maroon SUV approached the wrong way down the street. I don't remember

3

Q.   Okay you're not familiar with the area.

A.   I'm not familiar with the area so I don't know the names of the streets.

Q.   And it's fair to say you're only here on a visit?

A.   I'm here on a visit yes.

Q.   Initially before this SUV approached, did you observe this police officer

     walking from across the street?

A.   Yes I did.

Q.   From where the park area was?

A    Yes.

Q    Okay.  And did he come to the sidewalk where you were at?

A    He did not come to the sidewalk he was still in the road.

Q    On the road.

A.   Yes.

Q    Okay.  And while he was on the road you said a maroon SUV approached him

     in the opposite, coming from the opposite direction?

A    Yes.

Q    All right.  Is it fair to say that Boylston Street is a one way street?

A    Yes it is.

Q    Okay and you know it to be a one way street now?

A    Yes.

Q    And that vehicle was not coming the right way, it was going the wrong way,

     am I correct?

A    Correct.

4

Q   And the officer saw this? The vehicle was it traveling at a rate of speed, a

normal rate of speed or?

A   Ahm it seemed to be at a normal rate to me.

Q   Okay what would you say about 30 miles an hour or? That is the speed limit.

A   I, I believe so. I, I'm not sure exactly.

Q   Okay. Ah now tell us what happened when the vehicle approached the officer,

where was he situated?

A   He was situated on the side of the road closest to me. And ahm he seemed to

I'm sorry ...........

Q   Did anything separate you and that officer?

A   Yes.

Q   What separated you and that officer?

A   I believe there was a white car.

Q   A white car?

A   Yes.

Q   And it was parked there?

A   Yes.

Q   Okay. Now as that vehicle approached was the officer between the white car

and the maroon, and the maroon vehicle?

A   Yes he was.

Q   Okay. And then he stepped back at that time?

A   I, I believe that he took a short, a small step back.

Q   In order to avoid being hit?

5

A    I, I would imagine so.

Q    All right. And at that time he began, the officer began to chase the vehicle?

A    He began to chase the vehicle on foot. He stayed ahm pretty much even with
     the passenger side, the front passenger side of the window.

Q    Did he ever grab hold of the vehicle?

A    I did not see him touch the vehicle, no.

Q    What happened then, what transpired next?

A    As the vehicle approached the ahm intersection it began to make a turn. A
     right-turn.

Q    A right-hand turn?

A    Yes. And it slowed down as it approached the intersection.

Q    Okay.

A    And ahm I saw the officer standing in a stance with a ahm with the weapon
     aimed in towards the car. Towards the driver?

Q    Okay. And the vehicle was still moving at that time?

A    When he was standing like that the vehicle, I do not believe the vehicle was
     moving.

Q    When did he fire the weapon?

A    He, I, I believe that the vehicle had come to a stop before he fired the weapon.

Q    And did you see, how far away from the vehicle he was when he fired the
     weapon?

A    I believe he was around three or four feet away from the vehicle.

Q    And the vehicle, are you sure the vehicle was stopped at that time?

A   I am not positive. It was either completely stopped or going very slow.

Q   And how many, did you see the officer fire the shots?

A   I did not see him fire the shots.

Q   Okay. Could you see the officer fire the shots?

A   From where I was standing?

Q   Yes.

A   Yes.

Q   Well why didn't you see them? Did you turn?

A   What, well I might have. I might have turned away. As I, we heard gunshots so.

Q   Okay. But you didn't physically see, you didn't see the officer fire the shots?

A   I, I did not see smoke coming from his weapon. So I don't know if they were fired as I watched or not.

Q   Okay. All right. How many shots did you hear?

A   Ahm I believe I heard three or four shots. I think it was three though.

Q   Did the vehicle stop at that time?

A   The vehicle was stopped yes.

Q   And what did the officer do then?

A   The officer remained standing in that same position. The stance with his weapon pointed at the driver.

Q   Did he get close (sounds like) to the vehicle at that time, or?

A   I believe he did. At that point after the shots we ah, everyone had started running. And I, and I also began running and I was watching back over my

shoulder. We ahm, we ran to where CVS was and watched from there. It seemed as though there was not going to be anymore gunfire. We went back to the corner.

Q   Let me ask you, how many people were in the area at the time this occurred?

A   Ahm I would say that eight people probably ran with me in the direction that I was headed on my intersection. I do not know how many people were on the other corners.

Q   Okay from where you were, were people lingering around or were they, were there any people congregating in that corner by the bank. Or ..............

A   Just standing there hanging out?

Q   Ya.

A   I don't believe so, it appeared like they were all ..........

Q   So were there other people who witnessed what you witnessed?

A   Yes.

Q   Do you know any of those people?

A   I do not. Well I know my girlfriend.

Q   Margaret

A   Margaret, Margaret Lamb.

Q   Margaret Lamb.

Q   Ah Detective Connolly do you have any questions?

DET. CONNOLLY:

Q   Ya Dave I just ask this, ask you a couple of questions. Were there a lot of people in the area? I know that there was time going on up at the tent up there

across the way. Was there a lot of foot traffic?

A    Ahm I'm not, I'm not from around here so I don't know in relation to any other

day

Q    Ya

A    But it, it seemed compared to the afternoon when I had gotten there, there were

not as many people.

Q    Okay but where, there were people?

A    There were people. Yes.

Q    There were people

A    Yes

Q    On both sides of the street?

A    There were people on every side of the street, yes.

Q    All through the intersection on both, all sides? Just a regular

A    It was a regular thing.

Q    Busy?

A    Yes.

Q    Not as busy as the afternoon but

A    Right.

Q    There were a lot of foot traffic?

A    There were people crossing the street, yes.

Q    Okay. Ahm There's people behind you, in front of you?

A    Correct.

Q    Okay. Ahm Now I know when I talked to you earlier in my interview, you had

said that ah in fact I'm reading it hear the off, ...... the officer walked along the

passenger side of the vehicle. Would you like to clarify that for me?

A    I'd like to clarify yes.

Q    Okay good. Thank you.

A    It wasn't, it was not a walk it was more like a run. But it only occurred for

about three or four steps. So I wouldn't consider it running.

Q    Okay. Ahm ..... and you also if the officer was saying anything to the vehicle

or would you have been able to hear it?

A    I would think because of my proximity, I would've been able to hear it. But I

would say that because of the noise of the traffic and also the direction that he

was facing that there was a possibility that I might not have.

Q    Okay so he could have said something and you didn't, you didn't hear it?

A    He could have said something but I did not hear it, no.

Q    Okay. Ahm And the officer was standing he wasn't on the sidewalk but was

standing on the side closest to you?

A    Correct.

Q    Between the car, the white car. You, the white car, him and the SUV. Is that

fair to say?

A    Yes.

Q    Okay. Ah Okay ah and you were just with you and your girlfriend out for the

night?

A    Yes.

Q    So you didn't know any other people. You aren't from this area,

A    Correct.

Q    So there were other people around but you wouldn't have known them?

A    Exactly.

Q    Okay. So you had a hell of a nights visit?

A    Yes I did.

Q    Ah I can't think of anything else Sgt. Do you ah

SGT. WYSE:

Q    At the time you observed the officer on the street and the vehicle approaching
     did you make further observation of civilians crossing the street?

A    I do not think that people were crossing the street at that time.

Q    Did you see anybody crossing the street?

A    I did not remember seeing anyone.

Q    Okay. I have no further questions.

Q    Okay the time now.

DET. CONNOLLY:

Q    I ah would like to ask one more question. I know that you're saying you didn't
     see any, anybody, but we talked about there was people in the area. Is it
     possible there was people far, farther down the street? I mean, I'm not trying to
     box you in Dave,

A    People what crossing the street?

Q    Ya it was foot traffic,

A    It could have been possible.

Q    Ya. Okay.

A    Yes.

Q    All right. That's all I just wanted to give a fair represent, you said it's possible?

A    It is possible.

Q    Okay. Ah

A    Cause with the car, with the car in that position, from where I was standing I couldn't see the other side of the intersection.

Q    Okay all right great. All right. Ah that's, that's all we're looking for. Is a fair representation.

SGT. WYSE:

Q    All right the time now is approximately 0325. I want to thank you very much Mr. Anderson for your cooperation in this matter.

KK---------------------------------------------------------0-------------------------------------------------------

MASSACHUSETTS GENERAL HOSPITAL
RADIOLOGICAL CONSULTATION

NAME: BECKLEY, ROBERT                           MRN:  3986687        SEX:  M
                                                DOB:  10-Aug-1979

CT BRAIN-              AN #6925191
10-May-2002   10:31 PM
Transcribed on: 11-May-2002
Last Edited on: 12-May-2002

History: S/P GSW TO HEAD
=====================================================================
   This study was reviewed with Dr. Schaefer.

   History of gunshot wound to head.

   Head CT without contrast according to standard departmental protocol.
   There are no prior studies available for comparison.

   There is subcutaneous emphysema and metallic density within the right
   occipital soft tissues consistent with metallic fragments from the
   patient reported gunshot wound. There are a few tiny metallic
   fragments within the occipital bone itself with one tiny fragment near
   the inner cortex of the skull.

   On the bone algorithm images, there appears to be a suggestion of a
   lucency along the inner table of the occipital bone underlying the
   area area of the metallic fragments which may be secondary to an
   essentially nondisplaced fracture. This does not extend to the outer
   table of the skull.

   The brain is normal in attenuation and morphology. There is no
   evidence of intracranial hemorrhage or an acute territorial infarct.
   The size of the sulci, ventricles, and cisterns are age appropriate.
   The globes are normal. There is no extra-axial fluid collections.
   There is no evidence of mass effect or midline shift. There are no
   soft tissue abnormalities within the limits of the exam. The paranasal
   sinuses are clear.

   IMPRESSION:

   Status post gunshot wound with metallic fragments in the right
   occipital soft tissue and a few tiny metallic fragments within the
   occipital bone. Suggestion of an essentially nondisplaced right
   occipital fracture involving the inner table at the site of the
   gunshot wound.

   no intraparenchymal abnormality.

=====================================================================
RADIOLOGIST: TONG, SAMUEL, MD          /signed by/ SCHAEFER, PAMELA W, MD
RADIOLOGIST: SCHAEFER, PAMELA W, MD    /signed by/ SCHAEFER, PAMELA W, MD
In accordance with department policy, as teaching physician, I have
reviewed all images, and edited the report as required.

Massachusetts General Hospital
Emergency Department Record

ED Discharge Note

**Pat: BECKLEY, ROBERT**        MRN: 3986687        DOB: 08/10/1979        22 Years        Sex: M
**Registration Date/Time:**    05/10/2002 10:01 PM        **Provider: MATTHEW RISKEN**

| | |
|---|---|
| **Discharge Date/Time:** | 05/11/2002 08:38 |
| **Discharge Status:** | Discharged |
| **Condition on Discharge:** | Stable |
| **Patient States Complaint:** | GSW TO HEAD |
| **Diagnosis:** | gunshot to head |
| **Treatment Rendered:** | Head and neck ct- no evidence of skull fracture or intracranial abnormality |
| **Discharge Medications:** | Ibuprofen 600mg three times a day as needed for pain |
| **Follow Up Service:** | It is recommended that you receive follow-up care in the Surgical Dispensary Clinic. Please call 617-726-2760 to schedule an appt. Appointments are scheduled for early morning. If you have a managed care plan, check with your PCP before making this appt. 7 days to have the staples removed from your head . |
| **Disposition, Follow up & Instruction to Patient:** | Return for any vomiting, fevers, or difficulty walking |
| | Please call your primary care physician during normal business hours to report this Emergency Department visit. |

*I hereby acknowledge receipt of patient instructions. I understand that further diagnosis and treatment may be required and I have had emergency treatment only and I may be released before all medical problems are known and treated. I will arrange for any follow-up care as instructed.*

**Patient Signature:** _____    **Date:** _____

**Provider Signature:** _____    **Date:** 5 - 11-02

*This report was created by MATTHEW RISKEN, MD*

*For additional information regarding this visit please call 617-724-4100.*

PCP Name: UNKNOWN, PHYSICIAN    PCP #: 99993    PCP Phone: 000-000-0000    PCP Fax: 000-000-0000

## MASSACHUSETTS
## GENERAL HOSPITAL
BOSTON, MASSACHUSETTS

**TRAUMA SERVICE ADMISSION NOTE**
(page 1 of 3)

01/01/1901    M    05/10/0

398 66 87

UNKNOWN, WHITE MALE

☐ Trauma Stat    ☑ Trauma Alert    ☐ Trauma Consult

DATE: 5/10/02    TIME: 22:10

**HISTORY:**

ID/CC: _____

HPI: 23 ♂ GSW to ®

output 40 caliber weapon.

While sitting in car. (-) LOC.

4 shots fired total.

**SCENE INFORMATION:**
Time of Injury:
Location:
LOC: Yes No Duration: ____ mins
Hemodynamically: Stable Unstable
  BP ___/___ HR ___
  Arrest  CPR - duration ____ mins
Intubated: Yes No Size:
  Attempted?
Transport: EMT
  Medflight
  Private Vehicle
C - collar  Backboard  Splint
IV fluid given: ____ ml
Meds given: _____

**PENETRATING:**
GSW: Weapon: 40 Caliber
  Caliber/Gauge: ____
  Range: 20-30 ft
Stab Wound:
  Weapon:
  # of wounds:

**BLUNT:**
Motor Vehicle Crash:
  Driver  Passenger  front  back
Belt:  Lap  Shoulder  None
Airbag:  YES  NO
Rollover  YES  NO
Ejected  YES  NO
Impact:  YES  NO  Extric ___ mins
Speed:  High  Mod  Low
Vehicle damage: Severe  Mod  Minor
# of Vehicles: 1 2 3  More
Motor Cycle Crash:
  Driver    Passenger
  Helmeted:  YES  NO
Pedestrian struck:
  Speed:  High  Mod  Low
Bicyclist struck:
  Speed:  High  Mod  Low
  Helmeted:  YES  NO
Assault:
  Fist  Kick  Club  Other:
Fall/Jump:
  Height ____ ft
  Landing surface:

PMH:
1. unknown
2.
3.
4.
FAM HX:
SHx: Occupation:
  Family Contact:
ROS: HEENT
  CV
  GI
  Heme/Endo
  Neuro
  Skin

MEDS: unknown
ALLERGIES: unknown

ETOH ____ Drugs: ____ Tobacco: ____ ppd
PCP:
Eyes
Resp
GU
Musculoskeletal
Psych
Constitutional

**PHYSICAL EXAM:**
BP: 156/85  HR: 120/min  RR: 18/min  O₂ sat: ____ %  Temp: ____ °F/°C    99 FM
GENERAL: Awake · Combative · Uncooperative.

HEENT:
  Scalp/cranium: See next page
  Face: (-)
  Eyes: (-)
  Ears: (-)
  Nose: (-) (-)
  Oropharynx: (-)

Glasgow Coma Score - Total = 14

| Eye Opening | Verbal | Motor |
|---|---|---|
| 4 = Spontaneous | 5 = Oriented | 6 = Normal |
| 3 = To Voice | 4 = Confused | 5 = Localizes pain |
| 2 = To Pain | 3 = Inappropriate | 4 = Withdraws to pain |
| 1 = None | 2 = Incomprehensible | 3 = Decorticate (flexes) |
| S = Swollen shut | 1 = None | 2 = Decerebrate (extends) |
| | T = Intubated | 1 = None |

# MASSACHUSETTS
# GENERAL HOSPITAL
BOSTON, MASSACHUSETTS

PATIENT IDENTIFICATION

01/01/1901    M    05/10/

398 66 87

UNKNOWN, WHITE MALE

## TRAUMA SERVICE ADMISSION NOTE
### (page 2 of 3)



**NECK:**
Tender Cspine:          YES  NO
Tracheal deviation:     YES  NO
**CHEST:** Breath Sounds: Nrl    Flail: + ⊖
Ext. evidence trauma: ⊕
**COR:** Crepitance ⊖          Tenderness: ⊖
**ABD:** Soft, ND, NT
**PELVIS:** stable  unstable       tender  nontender
       lacs:
**GU:** Nrl
**RECTAL:** Gross: ⊖       Guaiac - pos / neg
      Tone: ⊕         Prostate: Nrl
**BACK:** Tenderness ⊖
      Stepoffs ⊖        Contusions ⊖
**EXTREM:** Deformities ⊖
       Contusions ⊖
       Lacerations ⊖
**PULSES:** Car (bruits)  Rad  Fem  DP  PT
       R            2+   2+   2+  2+
       L            2+   2+   2+  2+
**NEURO:**  A  V  P  U        GCS= 15
       Oriented: Person  Place  Time
       Pupils: OD - 4→2    OS- 4→2
       Motor: 5/5 all ext
       Sensory: 2+ throughout
       Reflexes:                      utox ⊖

**LABS:**

142 | 109 | 19 ⟨ 168
2.6 | 24 | 1.5
17.4 ⟩ 48.7 ⟨ 347
U/A ⊖

PT:           PTT:              TOX - EtOH: 2704
BBS sent:  YES  NO              Other:
                               B-HCG:
LFTs:  Bili T/D 0.4  Alk φ 115  SGOT 90   Amy 25
       Ca 9.0   Mg 2.0  Phos 2.3   Lipase 3.8
       CK 1414        Other:

**ECG:**

**FILMS:**                     | **Other Films:**
Cspine Lat ⊖
CXR AIR ⊖
Pelvis:
Head CT (I-) ⊖  - Bone fragments in soft tissue
C Spine: Plain film series//CT ⊖
   Adequate studies: YES  NO   Radiologically Cleared: YES  NO
T spine:              L/S spine:
Chest CT (I+):
ABD/Pelvis CT (I+):

**MASSACHUSETTS
GENERAL HOSPITAL**
BOSTON, MASSACHUSETTS

PATIENT IDENTIFICATION AREA

01/01/1901    M        05/10/0

398 66 87

UNKNOWN, WHITE MALE

**TRAUMA SERVICE ADMISSION NOTE**
(page 3 of 3)

**LIST OF INJURIES/PROBLEMS:**

1. GSW occiput
2. 
3. 
4. 
5. 
6. 
7. 
8. 

**Trauma Attending:** Schultz

**Trauma Chief Resident:** Walsh, Danielle

**Consults:** Hutter, Matt

☐ Ortho:

☐ NeuroSurg:

☐ Plastics:

☐ OMFS:

☐ Ophtho:

☐ GU:

☐ Other:

**PLAN/ISSUES:**

① Given Versed 6IV + Haldol 2IV for situational behavior control.

② Wounds irrigated c̄ 7L NS. + explored

_____ M.D.

# MGH EMERGENCY DEPARTMENT - TRAUMA FLOWSHEET

PATIENT IDENTIFICATION AREA

| TRAUMA TEAM ACTIVATION | ☐ STAT | | ☑ Alert | | |
|---|---|---|---|---|---|
| | NAME | INIT | CALLED | ARRIVED | |
| Trauma Attending | John Schaf | JS | 10:05 | 10:05 PM | |
| Tr.Chief Resident | | | | | |
| Tr.Nurse Coord. | | | | | |
| E.Med.Attending | Morgan | on arrival | | | |
| NEUROSURG | | | | | |
| ORTHO | | | | | |
| ANESTHESIA | | | | | |
| OTHER | | | | | |

2:50 PM 1:02

08/10/1979

398 bb 87

BECKLEY, ROBERT

## MECHANISM OF INJURY

Time of Arrival: 2:50

**Motor Vehicle Crash:**    ☐ via entry notification
- ☐ Driver    ☐ Passenger-front    ☐ Passenger-rear
- ☐ Belt: Lap  Shoulder    ☐ Air Bag    ☐ Car Seat
- ☐ Rollover    ☐ Ejected _____ ft    ☐ Extric _____ mins
- ☐ Front impact    ☐ Side impact  R  L    ☐ Rear impact
- ☐ High speed (>30mph)  ☐ Mod speed (10-30mph)  ☐ Low speed (<10mph)
- Vehicle damage:    ☐ major  ☐ moderate  ☐ minor  ☐ unknown

**Motor Cycle Crash:**
- ☐ Driver    ☐ Passenger    ☐ Helmet
- ☐ High speed (>30mph)  ☐ Mod speed (10-30mph)  ☐ Low speed (<10mph)
    ☐ unknown

**Other Blunt:**
- ☐ Pedestrian struck by _____
- ☐ Bicyclist struck by _____    ☐ Helmet
- ☐ Assault/beating    ☐ Weapon _____
- ☐ Fall/Jump    ☐ Height _____ ft    ☐ Onto _____
- ☐ Industrial
- ☐ Other _____

**Penetrating:**
- ☑ Gunshot  ☐ Handgun  ☐ Rifle  ☐ Caliber _____  ☐ Range _____
- ☐ Stab    ☐ Knife    ☐ Size    ☐ Other _____

## MODE OF TRANSPORT    PI DH+T
- ☑ Ground
- ☑ From scene
- ☐ From hospital _____  Referring MD _____
- ☐ Air _____
- ☐ Self _____

## PREHOSPITAL TREATMENT

**Airway:**
- ☐ Nasal    ☐ Oral    ☐ ET tube-size _____    ☐ Cricothyrotomy

**Oxygen/Ventilation:**
- ☐ Face mask  ☐ Nasal cannula  ☐ Ambu bag  ☐ O2sat _____ %
- ☐ Needle decompression  R  L    ☐ CPR

**Fluids:**
- ☐ IV#1 site _____ gauge _____ fluid _____ infused _____ ml
- ☐ IV#2 site _____ gauge _____ fluid _____ infused _____ ml

**Immobilization:**
- ☑ Collar  ☐ Headrolls  ☐ Backboard  ☐ Splint _____

**Medications:**
- ☐ Pain _____ mg, at (time) _____
- ☐ Sedation _____ mg, at (time) _____
- ☐ Paralytic _____ mg, at (time) _____
- ☐ Other: _____ mg, at (time) _____

**Vital Signs:**
- BP _____ HR _____ RR _____ / Temp _____
- Neuro A+0 x 3    GCS 15
- Comments: ? GSW back of head, william stato
  Thy Head 4 Gun Shots

## PAST MEDICAL HIST

- ☐ Unknown    ☐ None
- ☐ Cardiac _____
- ☐ Pulm _____
- ☐ DM _____

Meds: ☐ Unknown    ☐ None
- ☐ Coumadin _____
- _____
- _____
- _____

Allergies: ☐ Unknown    ☐ No

Weight: _____

PCP: _____
    Tel#: _____

NOK: _____
    Tel#: _____

### GLASGOW COMA SCALE

| Best eye-opening response | |
|---|---|
| Spontaneous | 4 |
| To voice | 3 |
| To pain | 2 |
| None | 1 |
| Swollen shut | S |
| Chemically paralyzed | P |

| Best verbal response | |
|---|---|
| Oriented | 5 |
| Confused | 4 |
| Inappropriate | 3 |
| Incomprehensible | 2 |
| None | 1 |
| Intubated | T |

| Best motor response | |
|---|---|
| Obeys commands | 6 |
| Localizes pain | 5 |
| Withdraws to pain | 4 |
| Flexes to pain | 3 |
| Extends to pain | 2 |
| None | 1 |
| Chemically paralyzed | P |

Recorded By: _____

Exhibit #5

| | |
|---|---|
| //03 | Criminal case docketed. (pks) |
| /2/03 | Jurisdictional notice issued.   (No j&c yet) [03-4299] JC follow-up due on 4/16/03. (pks) |
| 4/2/03 | Fee notice issued to Appellant Robert David Beckley. [03-4299]   IFP application/fee due on 4/17/03 for Robert David Beckley. (pks) |
| 4/8/03 | Judgment and commitment order filed in the District Court on 4/4/03. NOA date revised. [03-4299] ☺ (jsj) |
| 5/21/03 | Rule 45 notice issued to Appellant Robert David Beckley for fee default. IFP application/fee due on 6/5/03 for Robert David Beckley.  [03-4299] (pks) |
| 6/27/03 | ORDER FILED [3814302] dismissing case pursuant to Local Rule 45. [03-4299] ~ [3814302] (pks) |
| 6/27/03 | Mandate issued.  [03-4299] ~ [3814303]  Procedurally Terminated Without Judicial Action; Default. (pks) |
| 7/7/03 | Motion filed by Appellant Robert David Beckley to reinstate case [3818370-1].  [03-4299] ~ [3818370] (jsj) |
| 7/7/03 | Informal action taken terminating motion to reinstate case informing appellant that in order for the Court to consider a motion to reinstate, he must first rectify the default which is to either pay the $105 docketing fee or file an IFP application with the District Court.[3818370-1] [03-4299] ~ [3818478] (jsj) |
| 7/15/03 | Notice of district action filed.   Type of action taken: IFP application filed with District Court per conversation with Kim in the clerk's office USDC. Update will be forwarded once a ruling is made. [03-4299] ~ [3822295] (jsj) |
| 7/23/03 | District Court notice received of the granting of IFP for Appellant Robert David Beckley. [03-4299] ~ [3826980] (pks) |
| 7/24/03 | Case reopened. [03-4299] (pks) |
| 7/24/03 | ORDER FILED [3827503] to reopen case [3827503-1]. [03-4299] ~ [3827503] (pks) |
| 7/24/03 | ORDER FILED [3827548] appointing Donald Dickerson as CJA counsel for Appellant Robert David Beckley [3827548-1]. [03-4299] ~ [3827548] (pks) |
| /24/03 | Docketing notice issued. [03-4299] ~ [3827561] (pks) |
| /12/03 | Motion filed by Appellant Robert David Beckley to substitute attorney. [3837629-1] [03-4299] ~ [3837629] (jsj) |