102. As a result of their <u>police misconduct/malicious abuse of process</u>, defendants officer Joseph King deprive plaintiff's right to liberty, freedom against cruel and unusual punishment, state civil rights, in violation of fourth, fifth, sixth, eighth, and fourteenth amendments of the U.S. Constitution, 42 U.S.C.§1983.

103. Defendants, City of Boston, Boston Police Department, Boston Mayor Thomas Menino, Boston Police Commissioner past Paul Evans and present Boston Police Commissioner Kathleen O'Toole, John Does who were/are defendant officer King's supervisors are liable as a result of their failure to supervise, train, discipline defendants on an on going basis, and for their failure to promulgate and enforce policy's and customs to curtail the wanton conduct of officer Joseph King.

Wherefore, plaintiff demands judgment against all defendant's jointly and severally, for actual, general, special, compensatory damages in the amount of $5,000,000 and further demand judgment of said defendants, jointly and severally, for punitive damages in the amount deemed at time of trial to be fair, just, and appropriate plus the costs the costs of this action, including attorney fees, and such other relief deemed to be just and equitable.

**Count 10: <u>Reserved for negligence (until 6 months after presentment)</u>**

104. Plaintiff repeats, re-alleges, and incorporates by reference the allegations in <u>Paragraph 1 through 94</u> above and <u>exhibits 1,2, 3, 4 and 5</u> with the same force and effect as if here in set forth.

105. Defendants City of Boston, Boston Mayor Thomas Menino, Boston Police Department, John Does owed a duty to supervise or train the officers and to take steps to prevent events such as occurred here, to wit, the unlawful intention discharging of a firearm.

106. In the months following this policy, the Boston Police Department changed their policy n the use of deadly force.

107. Had the defendants previously implemented this policy, it is likely the shooting would never have taken place.

108. Defendant officer Joseph King owed a duty to act according to the standard of ordinary care of a police officer, to wit. Whereas the plaintiff was not in immanent threat at the

time of the shooting, the officer should have used less extreme actions, the failure of which was the proximate cause of plaintiff's injury.

109. Defendants City of Boston, Boston Police Department, Boston Mayor Thomas Menino, past Commissioner Paul Evans, Kathleen O'Toole who is presently the Boston Police Commissioner, and John Does breached their duty by failing to act as ordinary officials would act, to wit, by failing to perform their duties, and by falling adequately to control and to supervise his officers.

110. As a result of these breaches, which were the proximate causes of plaintiff's injuries, plaintiff suffered harm and damages.

111. Defendants City of Boston Police Department, Boston Mayor Thomas Menino, Boston Past Police Commissioner Paul Evans and present Police Commissioner Kathleen O'Toole, John Does who were/are supervisors of defendant of defendant officer Joseph King are liable under the doctrine of responeat superior.

Wherefore the plaintiff demands judgments against all the defendants, jointly and severally, for injunctive relief, and actual, special, compensatory, and punitive damages attorney's fees, cost, expenses, and interest in an amount deemed fair, just and appropriate at the time of trial.

**Count 11: <u>Reservered for negligent infliction of emotional distress until 6 months after presentation</u>**

112. Plaintiff repeats, re-alleges, and incorporates by reference the allegations in <u>paragraphs 1 through 102</u> above with the same force and <u>exhibits 1,2, 3, 4 and 5</u> with the same force and effect as if herein set forth.

113. Defendants negligently inflicted emotional distress on the plaintiff.

114. Defendants had an affirmative duty to perform their professional services in such a manner as not to inflict emotion distress on the plaintiff.

115. Defendants breached their duties to the plaintiff.

116. The plaintiff never interfered with the defendants' obligation under the above-described duties.

117. The plaintiff suffered not only physical symptoms, but also as a consequence of the physical injury, mentally by defendants' breach of duty.

118. Defendants, City of Boston, Boston Police Department, Boston Mayor Thomas Menino, Boston Police Commissioner past Paul Evans and present Boston Police Commissioner Kathleen O'Toole, John Does who were/are defendant officer King's supervisors are liable under the doctrine of respondeat superior.

119. As a result of the defendants' negligent conduct, plaintiff has suffered from and will continue to suffer physical symptoms, pain, anguish, severe emotional trauma, embarrassment, and humiliation.

Wherefore, the plaintiff demands judgment, including interest, jointly and severally, against all the defendants for actual, general, special, compensatory, and punitive damages, in al amount deemed at trial to be just fair and appropriate plus attorney's fees, And the cost of this proceeds and interest and such other relief deemed to be just and equitable.

\* Plaintiff demands jury trial on all counts and claims.

Respectfully submitted

Robert David Beckley, PRO SE

Send all correspondence to mailing
Address: Robert David Beckley, Pro Se
   277 Concord Rd.
   Bedford, MA 01730

RE: COMM. OF MASS  
RE: JOSEPH KING  
SPECIAL : 5/10/02  

MAY 11, 2002, 3:10 A.M.  
BPD DISTRICT 4  

(PLEASE NOTE: .....dots indicate transcriber could not get what was said.)

Conducting this interview is Sgt. Det. James Wyse of the Boston Police Homicide Unit. Also present is Det. Thomas Connolly of the Boston Police Department District 4.

## STATEMENT OF DAVID ANDERSON

Q.  Today is Saturday, May 11, the year 2002. The time now is approximately 3:10 a.m. And we are presently conducting an interview with Mr. David Anderson at District 4. Conducting this interview is myself, Sgt. Det. James J. Wyse of the Boston Police Homicide Unit and Det. Thomas Connolly assigned to District 4. This interview is relative to a police involved shooting that occurred on May 10, the year 2002. At approximately 9:45 p.m. in the vicinity of Boylston Street and Dartmouth Street. Sir for the record could you kindly state your name and spell your last name.

A.  My name is David Anderson. A-N-D-E-R-S-O-N.

Q.  And what is your address sir?

A.  My address is 12 Townsend Place, Syosset, New York.

Q   And how do you spell Syosset?

A.  S-Y-O-S-S-E-T

Q   And that's in New York. Sir earlier this evening did we speak with you relative to this incident. Ah police involved shooting?

A.  Yes.

Q.   All right. And again we're gonna go over that one more time. Earlier this evening on Friday night, were you, did you happen to be in the vicinity of Boylston Street and Dartmouth Street?

A.   Yes.

Q.   And while you were there did anything attract your attention to look around the area?

A.   Yes. I had noticed that there was police activity and I was curious to see what was going on.

Q.   Okay and who were you in the area with?

A.   I was with my girlfriend Margaret Lamb.

Q.   Margaret Lamb?

A.   Yes.

Q.   L-A-M-B?

A.   L-A-M-B.

Q.   And is Margaret also from New York?

A.   Yes.

Q.   Now what part of New York she from?

A.   She's also from Syosset.

Q.   Sir while you and Miss Lamb were in this area what if anything unusual occurred?

A.   As we watched the intersection a police officer walked around the intersection and then a ahm a maroon SUV approached the wrong way down the street. I don't remember

Q. Okay you're not familiar with the area.

A. I'm not familiar with the area so I don't know the names of the streets.

Q. And it's fair to say you're only here on a visit?

A. I'm here on a visit yes.

Q. Initially before this SUV approached, did you observe this police officer walking from across the street?

A. Yes I did.

Q. From where the park area was?

A. Yes.

Q. Okay. And did he come to the sidewalk where you were at?

A. He did not come to the sidewalk he was still in the road.

Q. On the road.

A. Yes.

Q. Okay. And while he was on the road you said a maroon SUV approached him in the opposite, coming from the opposite direction?

A. Yes.

Q. All right. Is it fair to say that Boylston Street is a one way street?

A. Yes it is.

Q. Okay and you know it to be a one way street now?

A. Yes.

Q. And that vehicle was not coming the right way, it was going the wrong way, am I correct?

A. Correct.

Q   And the officer saw this? The vehicle was it traveling at a rate of speed, a normal rate of speed or?

A   Ahm it seemed to be at a normal rate to me.

Q   Okay what would you say about 30 miles an hour or? That is the speed limit.

A   I, I believe so. I, I'm not sure exactly.

Q   Okay. Ah now tell us what happened when the vehicle approached the officer, where was he situated?

A   He was situated on the side of the road closest to me. And ahm he seemed to I'm sorry ............

Q   Did anything separate you and that officer?

A   Yes.

Q   What separated you and that officer?

A   I believe there was a white car.

Q   A white car?

A   Yes.

Q   And it was parked there?

A   Yes.

Q   Okay. Now as that vehicle approached was the officer between the white car and the maroon, and the maroon vehicle?

A   Yes he was.

Q   Okay. And then he stepped back at that time?

A   I, I believe that he took a short, a small step back.

Q   In order to avoid being hit?

A   I, I would imagine so.

Q   All right. And at that time he began, the officer began to chase the vehicle?

A   He began to chase the vehicle on foot. He stayed ahm pretty much even with the passenger side, the front passenger side of the window.

Q   Did he ever grab hold of the vehicle?

A   I did not see him touch the vehicle, no.

Q   What happened then, what transpired next?

A   As the vehicle approached the ahm intersection it began to make a turn. A right-turn.

Q   A right-hand turn?

A   Yes. And it slowed down as it approached the intersection.

Q   Okay.

A   And ahm I saw the officer standing in a stance with a ahm with the weapon aimed in towards the car. Towards the driver?

Q   Okay. And the vehicle was still moving at that time?

A   When he was standing like that the vehicle, I do not believe the vehicle was moving.

Q   When did he fire the weapon?

A   He, I, I believe that the vehicle had come to a stop before he fired the weapon.

Q   And did you see, how far away from the vehicle he was when he fired the weapon?

A   I believe he was around three or four feet away from the vehicle.

Q   And the vehicle, are you sure the vehicle was stopped at that time?

A   I am not positive. It was either completely stopped or going very slow.

Q   And how many, did you see the officer fire the shots?

A   I did not see him fire the shots.

Q   Okay. Could you see the officer fire the shots?

A   From where I was standing?

Q   Yes.

A   Yes.

Q   Well why didn't you see them? Did you turn?

A   What, well I might have. I might have turned away. As I, we heard gunshots so.

Q   Okay. But you didn't physically see, you didn't see the officer fire the shots?

A   I, I did not see smoke coming from his weapon. So I don't know if they were fired as I watched or not.

Q   Okay. All right. How many shots did you hear?

A   Ahm I believe I heard three or four shots. I think it was three though.

Q   Did the vehicle stop at that time?

A   The vehicle was stopped yes.

Q   And what did the officer do then?

A   The officer remained standing in that same position. The stance with his weapon pointed at the driver.

Q   Did he get close (sounds like) to the vehicle at that time, or?

A   I believe he did. At that point after the shots we ah, everyone had started running. And I, and I also began running and I was watching back over my

shoulder. We ahm, we ran to where CVS was and watched from there. It seemed as though there was not going to be anymore gunfire. We went back to the corner.

Q  Let me ask you, how many people were in the area at the time this occurred?

A  Ahm I would say that eight people probably ran with me in the direction that I was headed on my intersection. I do not know how many people were on the other corners.

Q  Okay from where you were, were people lingering around or were they, were there any people congregating in that corner by the bank. Or ............

A  Just standing there hanging out?

Q  Ya.

A  I don't believe so, it appeared like they were all ..........

Q  So were there other people who witnessed what you witnessed?

A  Yes.

Q  Do you know any of those people?

A  I do not. Well I know my girlfriend.

Q  Margaret ?

A  Margaret, Margaret Lamb.

Q  Margaret Lamb.

Q  Ah Detective Connolly do you have any questions?

DET. CONNOLLY:

Q  Ya Dave I just ask this, ask you a couple of questions. Were there a lot of people in the area? I know that there was time going on up at the tent up there

across the way. Was there a lot of foot traffic?

A   Ahm I'm not, I'm not from around here so I don't know in relation to any other day

Q   Ya

A   But it, it seemed compared to the afternoon when I had gotten there, there were not as many people.

Q   Okay but where, there were people?

A   There were people. Yes.

Q   There were people

A   Yes

Q   On both sides of the street?

A   There were people on every side of the street, yes.

Q   All through the intersection on both, all sides? Just a regular

A   It was a regular thing.

Q   Busy?

A   Yes.

Q   Not as busy as the afternoon but

A   Right.

Q   There were a lot of foot traffic?

A   There were people crossing the street, yes.

Q   Okay. Ahm There's people behind you, in front of you?

A   Correct.

Q   Okay. Ahm Now I know when I talked to you earlier in my interview, you had

said that ah in fact I'm reading it hear the off, ...... the officer walked along the passenger side of the vehicle. Would you like to clarify that for me?

A   I'd like to clarify yes.

Q   Okay good. Thank you.

A   It wasn't, it was not a walk it was more like a run. But it only occurred for about three or four steps. So I wouldn't consider it running.

Q   Okay. Ahm ..... and you also if the officer was saying anything to the vehicle or would you have been able to hear it?

A   I would think because of my proximity, I would've been able to hear it. But I would say that because of the noise of the traffic and also the direction that he was facing that there was a possibility that I might not have.

Q   Okay so he could have said something and you didn't, you didn't hear it?

A   He could have said something but I did not hear it, no.

Q   Okay. Ahm And the officer was standing he wasn't on the sidewalk but was standing on the side closest to you?

A   Correct.

Q   Between the car, the white car. You, the white car, him and the SUV. Is that fair to say?

A   Yes.

Q   Okay. Ah Okay ah and you were just with you and your girlfriend out for the night?

A   Yes.

Q   So you didn't know any other people. You aren't from this area,

A   Correct.

Q   So there were other people around but you wouldn't have known them?

A   Exactly.

Q   Okay. So you had a hell of a nights visit?

A   Yes I did.

Q   Ah I can't think of anything else Sgt. Do you ah

**SGT. WYSE:**

Q   At the time you observed the officer on the street and the vehicle approaching did you make further observation of civilians crossing the street?

A   I do not think that people were crossing the street at that time.

Q   Did you see anybody crossing the street?

A   I did not remember seeing anyone.

Q   Okay. I have no further questions.

Q   Okay the time now.

**DET. CONNOLLY:**

Q   I ah would like to ask one more question. I know that you're saying you didn't see any, anybody, but we talked about there was people in the area. Is it possible there was people far, farther down the street? I mean, I'm not trying to box you in Dave,

A   People what crossing the street?

Q   Ya it was foot traffic,

A   It could have been possible.

Q   Ya. Okay.

A   Yes.

Q   All right. That's all I just wanted to give a fair represent, you said it's possible?

A   It is possible.

Q   Okay. Ah

A   Cause with the car, with the car in that position, from where I was standing I couldn't see the other side of the intersection.

Q   Okay all right great. All right. Ah that's, that's all we're looking for. Is a fair representation.

SGT. WYSE:

Q   All right the time now is approximately 0325. I want to thank you very much Mr. Anderson for your cooperation in this matter.

KK--------------------------------------------------0--------------------------------------------------