MASSACHUSETTS GENERAL HOSPITAL
RADIOLOGICAL CONSULTATION

NAME: BECKLEY, ROBERT                    MRN: 3986687      SEX: M
                                         DOB: 10-Aug-1979

CT BRAIN-            AN #6925191
10-May-2002    10:31 PM
Transcribed on: 11-May-2002
Last Edited on: 12-May-2002

History: S/P GSW TO HEAD
==================================================================
This study was reviewed with Dr. Schaefer.

History of gunshot wound to head.

Head CT without contrast according to standard departmental protocol. There are no prior studies available for comparison.

There is subcutaneous emphysema and metallic density within the right occipital soft tissues consistent with metallic fragments from the patient reported gunshot wound. There are a few tiny metallic fragments within the occipital bone itself with one tiny fragment near the inner cortex of the skull.

On the bone algorithm images, there appears to be a suggestion of a lucency along the inner table of the occipital bone underlying the area area of the metallic fragments which may be secondary to an essentially nondisplaced fracture. This does not extend to the outer table of the skull.

The brain is normal in attenuation and morphology. There is no evidence of intracranial hemorrhage or an acute territorial infarct. The size of the sulci, ventricles, and cisterns are age appropriate. The globes are normal. There is no extra-axial fluid collections. There is no evidence of mass effect or midline shift. There are no soft tissue abnormalities within the limits of the exam. The paranasal sinuses are clear.

IMPRESSION:

Status post gunshot wound with metallic fragments in the right occipital soft tissue and a few tiny metallic fragments within the occipital bone. Suggestion of an essentially nondisplaced right occipital fracture involving the inner table at the site of the gunshot wound.

no intraparenchymal abnormality.

==================================================================
RADIOLOGIST: TONG, SAMUEL, MD          /signed by/ SCHAEFER, PAMELA W, MD
RADIOLOGIST: SCHAEFER, PAMELA W, MD    /signed by/ SCHAEFER, PAMELA W, MD
In accordance with department policy, as teaching physician, I have reviewed all images, and edited the report as required.

Massachusetts General Hospital  
Emergency Department Record

ED Discharge Note

| | |
|---|---|
| Pat: BECKLEY, ROBERT | MRN: 3986687    DOB: 08/10/1979    22 Years    Sex: M |
| Registration Date/Time: | 05/10/2002 10:01 PM    Provider: MATTHEW RISKEN |

**Discharge Date/Time:** 05/11/2002 08:38

**Discharge Status:** Discharged

**Condition on Discharge:** Stable

**Patient States Complaint:** GSW TO HEAD

**Diagnosis:** gunshot to head

**Treatment Rendered:** Head and neck ct- no evidence of skull fracture or intracranial abnormality

**Discharge Medications:** Ibuprofen 600mg three times a day as needed for pain

**Follow Up Service:** It is recommended that you receive follow-up care in the Surgical Dispensary Clinic. Please call 617-726-2760 to schedule an appt. Appointments are scheduled for early morning. If you have a managed care plan, check with your PCP before making this appt. 7 days to have the staples removed from your head.

**Disposition, Follow up & Instruction to Patient:** Return for any vomiting, fevers, or difficulty walking

Please call your primary care physician during normal business hours to report this Emergency Department visit.

*I hereby acknowledge receipt of patient instructions. I understand that further diagnosis and treatment may be required and I have had emergency treatment only and I may be released before all medical problems are known and treated. I will arrange for any follow-up care as instructed.*

**Patient Signature:** _____    **Date:** _____

**Provider Signature:** _[signature]_    **Date:** 5-11-02

*This report was created by MATTHEW RISKEN, MD*
*For additional information regarding this visit please call 617-724-4100.*

PCP Name: UNKNOWN, PHYSICIAN    PCP#: 99993    PCP Phone: 000-000-0000    PCP Fax: 000-000-0000

---

Printed on 05/11/2002    by MATTHEW RISKEN    Page: 1  
Confidential Patient Information    **End of Note**

# MASSACHUSETTS GENERAL HOSPITAL
BOSTON, MASSACHUSETTS

## TRAUMA SERVICE ADMISSION NOTE
(page 1 of 3)

01/01/1901   M   05/10/0?

398 66 87

UNKNOWN, WHITE MALE

- ☐ Trauma Stat
- ☒ Trauma Alert
- ☐ Trauma Consult

DATE: 5/10/0?   TIME: 22:10

**HISTORY:**
ID/CC: _____

HPI: 23 ♂ GSW to (R) Occiput. 40 caliber weapon. While sitting in car. ⊖ LOC. Shots fired ?stuv.

**SCENE INFORMATION:**
- Time of Injury:
- Location:
- LOC: Yes No Duration: ___ mins
- Hemodynamically: Stable Unstable
- BP ___/___ HR ___
- Arrest  CPR - duration ___ mins
- Intubated: Yes No Size: ___
  - Attempted?
- Transport: EMT
  - Medflight
  - Private Vehicle
- C - collar  Backboard  Splint ___
- IV fluid given: ___ ml
- Meds given: ___

**PENETRATING:**
- (GSW:) Weapon: 40 Caliber
- Caliber/Gauge: ___
- Range: 20-30 ft
- Stab Wound:
  - Weapon: ___
  - # of wounds: ___

**BLUNT:**
- Motor Vehicle Crash:
  - Driver  Passenger  front  back
  - Belt:  Lap  Shoulder  None
  - Airbag: YES NO
  - Rollover YES NO
  - Ejected YES NO
  - Impact: YES NO Extric ___ mins
  - Speed: High Mod Low
  - Vehicle damage: Severe Mod Minor
  - # of Vehicles: 1  2  3  More
- Motor Cycle Crash:
  - Driver  Passenger
  - Helmeted: YES NO
- Pedestrian struck:
  - Speed: High Mod Low
- Bicyclist struck:
  - Speed: High Mod Low
  - Helmeted: YES NO
- Assault:
  - Fist  Kick  Club  Other:
- Fall/Jump:
  - Height: ___ ft
  - Landing surface:

**PMH:**
1. unknown
2. ___
3. ___
4. ___

**MEDS:** unknown

**ALLERGIES:** unknown

**FAM HX:** ___
**SHx:** Occupation: ___
Family Contact: ___
**ROS:** HEENT ___
 CV ___
 GI ___
 Heme/Endo ___
 Neuro ___
 Skin ___

ETOH unknown  Drugs: ___  Tobacco: ___ ppd
PCP: ___
Eyes ___
Resp ___
GU ___
Musculoskeletal ___
Psych ___
Constitutional ___

**PHYSICAL EXAM:**
BP: 156/85   HR: 120/min   RR: 18/min   O2 sat: 99 RM %   Temp: ___ °F/°C

GENERAL: Awake. Combative. Uncooperative.

**HEENT:**
Scalp/cranium: See next page
Face: ⊖
Eyes: ⊖
Ears: ⊖
Nose: ⊖ ⊖
Oropharynx: ⊖

Glasgow Coma Score - Total = 14

| Eye Opening | Verbal | Motor |
|---|---|---|
| **4 = Spontaneous** (circled) | 5 = Oriented | **6 = Normal** (circled) |
| 3 = To Voice | **4 = Confused** (circled) | 5 = Localizes pain |
| 2 = To Pain | 3 = Inappropriate | 4 = Withdraws to pain |
| 1 = None | 2 = Incomprehensible | 3 = Decorticate (flexes) |
| S = Swollen shut | 1 = None | 2 = Decerebrate (extends) |
| | T = Intubated | 1 = None |

## MASSACHUSETTS GENERAL HOSPITAL
BOSTON, MASSACHUSETTS

### TRAUMA SERVICE ADMISSION NOTE
(page 2 of 3)

01/01/1901   M   05/10/

398 66 87
UNKNOWN, WHITE MALE

NECK:
   Tender Cspine: YES (NO)
   Tracheal deviation: YES (NO)
CHEST: Breath Sounds: NrL   Flail: + (–)
   Ext. evidence trauma (–)
   Crepitance (–)   Tenderness: (–)
COR:
ABD: Soft, ND, NT
PELVIS: (stable) unstable   tender (nontender)
   lacs:
GU: NrL
RECTAL: Gross: (–)   Guaiac - pos / (neg)
   Tone: (+)   Prostate: NrL
BACK: Tenderness (–)
   Stepoffs (–)   Contusions (–)
EXTREM: Deformities (–)
   Contusions (–)
   Lacerations (–)
PULSES:  Car (bruits)  Rad  Fem  DP  PT
  R              2+   2+   2+   2+
  L              2+   2+   2+   2+
NEURO:  A V P U   GCS= 15
   Oriented: Person  Place  Time
   Pupils: OD - 4→2   OS - 4→2
   Motor: 5/5 all ext
   Sensory: 2+ throughout
   Reflexes: 2

u tox (–)



LABS:
142 | 109 | 19 <  168
2.6 | 24 | 1.5
17.4 > 18.7 < 347
U/A (–)

PT:      PTT:       TOX - EtOH: 2704
BBS sent: (YES) NO   Other:
                     β-HCG:
LFTs: Bili T/D 0.4   Alk φ 115   SGOT 90   Amy 25
Ca 9.0   Mg 2.1   Phos 2.3   Lipase 3.8
CK 1414   Other:

ECG:

FILMS:                                    Other Films:
Cspine Lat (–)
CXR AP (–)
Pelvis:
Head CT (I–) (–) - Bullet fragments in soft tissue
C Spine: Plain film series // CT (–)
   Adequate studies: YES NO  Radiologically Cleared: YES NO
T spine:         L/S spine:
Chest CT (I+):
ABD/Pelvis CT (I+):

**MASSACHUSETTS GENERAL HOSPITAL**
BOSTON, MASSACHUSETTS

## TRAUMA SERVICE ADMISSION NOTE
(page 3 of 3)

PATIENT IDENTIFICATION AREA

01/01/1901  M  05/10/0?

398 bb 87

UNKNOWN, WHITE MALE

**LIST OF INJURIES/PROBLEMS:**

1. GSW Occiput
2. 
3. 
4. 
5. 
6. 
7. 
8. 

**Trauma Attending:** Schultz

**Trauma Chief Resident:** Walsh, Patience

**Consults:** Hutter, Matt

- ☐ Ortho:
- ☐ NeuroSurg:
- ☐ Plastics:
- ☐ OMFS:
- ☐ Ophtho:
- ☐ GU:
- ☐ Other:

**PLAN/ISSUES:**

1. Given Versed 6IV + Haldol 20IV for situational behavior control.

2. Wounds irrigated c̄ TLNS. + explored

_____ M.D.

## MGH EMERGENCY DEPARTMENT - TRAUMA FLOWSHEET

PATIENT IDENTIFICATION AREA

| TRAUMA TEAM ACTIVATION | ☐ STAT | | ☐ Alert 2/15/03 1102 | |
|---|---|---|---|---|
| | NAME | INIT | CALLED | ARRIVED |
| Trauma Attending | John Schef | JS | 10:08 | 10:05 PM |
| Tr.Chief Resident | | | | |
| Tr.Nurse Coord. | | | | |
| E.Med.Attending | Morgule | | on arrival | |
| NEUROSURG | | | | |
| ORTHO | | | | |
| ANESTHESIA | | | | |
| OTHER | | | | |

398 66 87
08/10/1979   M  06/11/02
BECKLEY, ROBERT

Time of Arrival: 2150

### MECHANISM OF INJURY
**Motor Vehicle Crash:**   ☐ via entry notification
- ☐ Driver          ☐ Passenger-front     ☐ Passenger-rear
- ☐ Belt: Lap  Shoulder   ☐ Air Bag       ☐ Car Seat
- ☐ Rollover       ☐ Ejected_____ft       ☐ Extric_____mins
- ☐ Front impact   ☐ Side impact R L      ☐ Rear impact
- ☐ High speed (>30mph) ☐ Mod speed (10-30mph) ☐ Low speed (<10mph)
- Vehicle damage:  ☐ major ☐ moderate ☐ minor ☐ unknown

**Motor Cycle Crash:**
- ☐ Driver         ☐ Passenger            ☐ Helmet
- ☐ High speed (>30mph) ☐ Mod speed (10-30mph) ☐ Low speed (<10mph)
- ☐ unknown

**Other Blunt:**
- ☐ Pedestrian struck by _____
- ☐ Bicyclist struck by _____     ☐ Helmet
- ☐ Assault/beating  ☐ Weapon _____
- ☐ Fall/Jump  ☐ Height____ft  ☐ Onto _____
- ☐ Industrial
- ☐ Other _____

**Penetrating:**
- ☑ Gunshot  ☐ Handgun  ☐ Rifle  ☐ Caliber____  ☐ Range____
- ☐ Stab     ☐ Knife    ☐ Size____  ☐ Other____

### MODE OF TRANSPORT
- ☑ Ground  PI D Hwt    ☐ Air _____    ☐ Self
- ☑ From scene
- ☐ From hospital _____ Referring MD _____

### PREHOSPITAL TREATMENT
**Airway:**
- ☐ Nasal  ☐ Oral  ☐ ET tube-size _____  ☐ Cricothyrotomy

**Oxygen/Ventilation:**
- ☐ Face mask  ☐ Nasal cannula  ☐ Ambu bag  ☐ O2sat____%
- ☐ Needle decompression  R  L    ☐ CPR

**Fluids:**
- ☐ IV#1 site ____ gauge ____ fluid ____ infused ____ ml
- ☐ IV#2 site ____ gauge ____ fluid ____ infused ____ ml

**Immobilization:**
- ☑ Collar  ☐ Headrolls  ☐ Backboard  ☐ Splint _____

**Medications:**
- ☐ Pain _____ mg, at (time) _____
- ☐ Sedation _____ mg, at (time) _____
- ☐ Paralytic _____ mg, at (time) _____
- ☐ Other: _____ mg, at (time) _____

### Vital Signs:
BP ____ HR ____ RR ____ Temp ____
Neuro A+O x 3                     GCS 15
Comments: 2 GSW back of head, w/ws stat
they heard 4 gun shots

### PAST MEDICAL HIST
- ☐ Unknown  ☐ None
- ☐ Cardiac _____
- ☐ Pulm _____
- ☐ DM _____

Meds: ☐ Unknown  ☐ None
☐ Coumadin _____

Allergies: ☐ Unknown  ☐ None

Weight: _____

PCP: _____
Tel#: _____

NOK: _____
Tel#: _____

### GLASGOW COMA SCALE

**Best eye-opening response**
| | |
|---|---|
| Spontaneous | 4 |
| To voice | 3 |
| To pain | 2 |
| None | 1 |
| Swollen shut | S |
| Chemically paralyzed | P |

**Best verbal response**
| | |
|---|---|
| Oriented | 5 |
| Confused | 4 |
| Inappropriate | 3 |
| Incomprehensible | 2 |
| None | 1 |
| Intubated | T |

**Best motor response**
| | |
|---|---|
| Obeys commands | 6 |
| Localizes pain | 5 |
| Withdraws to pain | 4 |
| Flexes to pain | 3 |
| Extends to pain | 2 |
| None | 1 |
| Chemically paralyzed | P |

Recorded By: _____

Boston.com / Boston Globe Archives / Easy Print Version    Page 1 of 1
Case 1:04-cv-10909-RWZ    Document 72-4    Filed 05/12/2005    Page 8 of 13
EXHIBIT 4



THIS STORY HAS BEEN FORMATTED FOR EASY PRINTING



# LESS DEADLY FORCE

**Date:** September 10, 2002 **Page:** A14 **Section:** Editorial

BOSTON POLICE are told, and supposedly trained, to avoid firing at moving vehicles. The message hasn't gotten through, and great harm is being done.

Yesterday Commissioner **Paul** Evans proposed a change in the Police Department's policy on the **use** of **deadly force** that would remove some discretion from officers. The recommendation is sound. If followed religiously, it should lead to fewer injuries and deaths of officers, suspects, and bystanders. The department's current policy states that "the moving vehicle itself shall not constitute the threatened **use** of **deadly force** unless there are no reasonable or apparent means of escape." Evans wants to toughen that regulation by requiring officers to "reposition themselves" and wait for reinforcements. They are not to fire. Police bullets, he says, rarely stop autos. They are more likely to rub out public confidence in the department's **use** of **deadly force**.

Evans's proposal comes less than 48 hours after a police officer shot and killed Eveline Barros-Cepeda, a 25-year-old passenger in a car driven by a man who tried to elude police after a traffic stop in Dorchester. It was the fourth **deadly** discharge of a firearm by police this year and the eighth in the last 22 months.

A sharp increase in the **use** of **deadly force** is sometimes the sign of a department that suffers from lax supervision, racially biased policing, or a listless internal affairs department. That doesn't seem to be the case in Boston, where police officials have a longstanding commitment to neighborhood policing. Here the problem appears to be one of training. Officers may be failing to analyze properly the precipitating events that lead up to the decision to shoot or hold their fire. The reaction time of officers is not the problem. Judgment is the problem.

Evans also promises to address this gap through training that integrates theory and practice. He will need, and deserves, the cooperation of the police union.

The average Bostonian appreciates the dangers faced by police and doesn't claim expertise in firearms. But some things are obvious **even** to the untrained eye. It is easy to see, for example, how police fired on an unstable woman last July when they encountered the knife-wielding suspect who had evidently slashed the throats of her two young children. But what of the officer in April 2001 who clung to a sunroof with one hand while firing with the other on a young drug suspect in the North End? And how to justify the actions last May of an officer who fired at a car in crowded Copley Square during an outdoor gala, barely missing partygoers?

Until two years ago the Boston Police Department ranked among the major law enforcement agencies whose officers were least likely to shoot and kill. The public wants to see the department regain its place on that list.

Perform a new search

Boston Police Department                                    Rules and Procedures

Rule 303
April 11, 2003

## USE OF DEADLY FORCE

### INTRODUCTION

This rule is issued to provide guidelines and regulations governing the use of deadly force by members of the Department, to ensure the safety of our police officers and the public, and to establish procedures for the orderly investigation of firearm discharges. Its provisions are effective immediately, superseding all previously issued rules, regulations, orders, bulletins and directives regarding the use of deadly force by Boston police officers.

In the establishing of these regulations it is understood that they will not likely cover every conceivable situation which may arise. In such situations officers are expected to act with intelligence and sound judgment, attending to the spirit of the rule. Any deviations from the provisions of Sections 5, 6, 7, or 8 of this rule shall be examined on a case by case basis.

**Note:** Weapons and ammunition coming into the custody of Police Department personnel shall be handled in accordance with the provisions of Rule No. 311, **Procedures for the Ballistics Unit.**

Sec. 1 Definitions: For the purpose of this rule, the following definitions will apply:

> **Deadly Force** is that degree of force likely to result in death or great bodily injury. The discharge of a firearm toward a person constitutes the use of deadly force even if there is no express intent to kill or cause great bodily injury.
>
> **Great bodily injury** means bodily injury which creates a substantial risk of death or which is likely to cause serious injury, permanent disfigurement or loss, or extended impairment of the function of any bodily member or organ.
>
> **Immediate danger of death or great bodily injury** includes circumstances under which (1) such a danger exists in reality, or (2) such a danger is apparent, and the officer is unable to affirm or disaffirm its actual existence.
>
> **Prudence** means using cautious, discreet or shrewd action and having due regard for the rights of citizens while maintaining an awareness of the responsibilities of acting as a police officer.
>
> **Reasonableness** is moderate and/or fair action within reason, suitable to the confrontation.

**The Investigating Officer in Charge (IOIC)** is the Detective Superior Officer of the Firearm Discharge Investigation Team so designated by the Commander of the Homicide Unit and assigned to investigate the facts of the incident and to determine the justification for the use of deadly force.

**Sec. 2 General Considerations:** The primary purpose for which a sworn member of the Department is issued a firearm and trained in its use is the protection of life and limb, both theirs and that of every other person needing such protection. Although the firearm is a necessary weapon for present-day policing, its potential to inflict death or great bodily injury mandates that it be used with discrimination and within clearly-defined limits. This rule establishes those limits.

In the interests of personal safety, police officers must seek to gain and maintain an advantage over persons known or suspected to be armed. Such an "edge" may take the form of numerical superiority in manpower and firepower or of an officer staying "one jump ahead" of a subject likely to produce a weapon. Officers seeking to maintain the advantage over a subject suspected of being armed are in a difficult position; they must be prepared to use a firearm should it be necessary, yet show the restraint required to ensure the propriety of their actions. The situation demands the utmost ability to think clearly, quickly and decisively and to use the firearm in a safe and effective manner.

The Boston Police Department recognizes its legal duty to protect the rights of all individuals to due process of law and a fair trial. Its members are thereby bound to refrain from any use of force that unnecessarily tends to administer punishment at the hands of a police officer. The responsibility for punishment of criminal offenders rests solely with duly constituted courts of law and penal institutions and is by no means extended to the police.

**Sec. 3 Training and Qualification:** Police officers in this Department will be held accountable for proficiency as well as compliance with Department policy in the use of firearms. All sworn members of the Department are responsible for maintaining a degree of expertise in the use and handling of all firearms approved for their carrying. Specifically, sworn members authorized to carry a firearm shall qualify with their issued firearm(s) on a course of instruction approved by the Massachusetts Criminal Justice Training Council at least twice each year - once during the period from January 1st - June 30th and once during the period from July 1st - December 31st. A qualifying score of 80% or higher is required. When members of the Department are issued a new weapon, they shall qualify at the Department range in the use of that weapon prior to resuming street duties. This shall not apply to the emergency use of a comparable spare weapon issued on a temporary basis.

In the event an officer fails to qualify, the officer will be temporarily re-assigned to the Department Range. It will be the responsibility of the Commanding Officer of the Department Range to ensure that the officer's firearm is taken from them until such qualification is achieved. Any officer who, after such intensive training as determined by the Commanding Officer of the Department Range, has still failed to qualify will be subject to reevaluation as to their fitness to continue to perform the duties of a police officer. Under no conditions shall an officer who fails to qualify be allowed to perform any street police duties.

Frequently, officers have activated themselves during off-duty situations where there is a need to draw a personal firearm and the possibility exists to use such weapon. On self activation, the officer's actions are guided by all Departmental rules and regulations, hence there is a need to show familiarization with any personal weapon which is carried while off-duty.

Members of the Department who are licensed to carry firearms pursuant to M.G.L. c. 140, § 131 and who own and carry a personal firearm while off-duty shall fire a familiarization course as designed by the Commanding Officer of the Department Range. This course will be fired

during regular qualification times and police officers shall provide their own ammunition.

Officers complying with this portion of the rule will notify their Commanding Officer of their intent to do so and shall be authorized to carry more than one weapon while on duty for the sole purpose of attending the familiarization course at the Department Range. This authorization shall be temporary and will only allow the officer to carry the off-duty weapon to and from the range. The off-duty weapon shall be secured in the District gun locker prior and subsequent to completion of the familiarization course.

**Sec. 4 Security and Maintenance of Department Firearms:** Members of the force shall take all reasonable precautions to insure that weapons issued to them by the Department are protected from loss, misuse or theft.
Members are responsible for keeping their issued weapons clean and in good working order. A weapon which malfunctions shall be returned to the Boston Police Range forthwith.

**Sec. 5 Pointing Firearms:** Officers shall not point firearms at persons except when reasonably justified under the circumstances. In situations involving the strong possibility of great danger (e.g. searching a building pursuant to a burglar alarm or approaching a business establishment on a report of a robbery in progress, etc.) officers should carry their weapon in a position that will facilitate its speedy and safe use. While officers should not point a weapon unless they are prepared to use it, the fact that they have done so must not be interpreted as an obligation to fire.

**Sec. 6 Discharge of Firearms:** The law permits police officers to use reasonable force in the performance of their duties but only to the degree required to overcome unlawful resistance. This doctrine of "reasonable use of force" applies to the use of firearms as well as to non-lethal force. Also, because of their destructive potential, the use of firearms must be further restricted to the purpose for which they are issued, that of protecting life and limb. The discharge of a firearm by a member of the Department is permissible only when:

> A. There is no less drastic means available to defend oneself or another from unlawful attack which an officer has reasonable cause to believe could result in death or great bodily injury, or
>
> B. There is no less drastic means available to apprehend a fleeing felon when the officer has probable cause to believe that: (1) the subject has committed a felony during the commission of which they inflicted or threatened to inflict deadly force upon the victim, or (2) that there is substantial risk that the felon in question will cause death or great bodily injury if their apprehension is delayed, or
>
> C. There is no less drastic means available to kill a dangerous animal or one so badly injured that humanity requires its removal from further suffering.

Officers who find it necessary, under the provisions of this rule, to discharge firearms shall exercise due care for the safety of persons and property in the area and shall fire only when reasonably certain that there is no substantial risk to bystanders.

**Sec. 7 Warning Shots and Signals:** Firearms shall not be used as a signaling device. A firearm shall not be used to summon assistance or to give signals or to warn a fleeing felon to stop. This does not mean that officers may not discharge their firearm without the intent to kill

or disable if in their best judgment there is no alternate method of convincing a would-be attacker that they are ready and able to defend themselves or others if the potential threat is not discontinued.

**Sec. 8 Moving/Fleeing Vehicles:** Firearms shall not be discharged from a moving vehicle. Firearms shall not be discharged at a moving or fleeing vehicle unless the officer or another person is currently being threatened with deadly force by means other than the moving vehicle. For the purposes of this section, the moving vehicle itself shall not constitute the threatened use of deadly force. Therefore, officers shall move out of the path of any oncoming vehicle instead of discharging a firearm at it or any of its occupants. Moving to cover, repositioning and/or waiting for additional responding units to gain and maintain a tactically superior police advantage maximizes officer safety and minimizes the necessity for using deadly force.

The above prohibitions exist for three reasons:

1. Bullets fired at moving motor vehicles are extremely unlikely to stop or disable the motor vehicle,

2. Bullets fired may miss the intended target or ricochet and cause injury to officers or other innocent persons, and

3. The vehicle may crash and cause injury to officers or other innocent persons if the bullets disable the operator.

**Sec. 9 Permissible Weapons and Ammunition:** Officers shall carry on duty only weapons and ammunition authorized and issued by the Department. Whenever an officer is carrying a currently issued semi-automatic pistol (.40 cal. Glock), the pistol shall be carried with a fully loaded magazine (13 rounds in the large capacity magazine; 9 rounds in the small capacity magazine), in addition to having one round in the chamber. Spare magazines shall be kept fully loaded.

Regardless of whether an officer is on duty or off duty, Department issued weapons may only be carried on one's person in Department issued or Department authorized holsters.

It is the responsibility of a police officer not to accept a Department issued weapon unless the officer has qualified in its use. Prior to issue, the issuing Superior Officer shall inquire of any officer to whom a Department weapon is to be issued whether or not that officer is qualified in its use.

Other weapons authorized by the Department for special operations may be selectively issued to qualified personnel by a Superior Officer, if they are deemed necessary to ensure the safety and effectiveness of police operations. Officers armed with such weapons shall use those weapons in accordance with the provisions of this rule as well as any additional guidelines issued at the time.

All necessary repairs or modifications to Department issued firearms and other weapons must be performed by a Department armorer or a Department approved gunsmith at the direction of the Commanding Officer of the Boston Police Range.

**Sec. 10 Reporting Firearms Discharges:** All firearm discharges, except discharges which

occur during Department authorized or approved firearms training, while lawfully engaged in target practice or while hunting (unless a discharge occurring during one of these three exceptions results in death, personal injury or property damage), require the submission of an incident report (1.1) which includes information relative to injuries and damage to property.

- An officer who discharges his firearm during the course of his duties shall immediately notify the Operations Division that they have been involved in a "Code 303" and request that a Patrol Supervisor respond to the scene. The officer shall make a verbal report of the discharge to the responding Patrol Supervisor. In the event that someone has been injured, officers will request medical assistance. The supervisor shall request that Operations make all appropriate notifications including the Firearm Discharge Investigation Team. A full written report of the discharge must then be made prior to the termination of the officer's tour of duty, unless medical reasons dictate that the report be made at a later date.

- An off-duty officer discharging a firearm in the City of Boston shall immediately notify an Operations Division Supervisor. The Operations Division shall notify the Officer in Charge of the District in which the discharge took place and the Firearm Discharge Investigation Team. The officer involved in the firearm discharge shall submit the necessary reports without delay to a Superior Officer assigned to the Firearm Discharge Investigation Team. The Officer in Charge of the District in which the discharge took place shall notify the off-duty officer's Commanding Officer.

- An officer who discharges a weapon outside of the City of Boston shall immediately notify and make a report of the discharge to the Police Department which has jurisdiction where the discharge occurred, identify themself as being a Boston police officer and notify an Operations Division Supervisor as soon as possible. The Operations Division shall immediately notify the officer's Commanding Officer and the Firearm Discharge Investigation Team.
Officers who have discharged a firearm shall complete a BPD Form 2415 (Firearms Discharge Report) in its entirety.

**Sec. 11 Investigation of Firearm Discharges:** The manner in which police officers use firearms is an extremely critical issue to the Department, one in which the community and the courts allow little margin for error. To insure that proper control in this area is maintained, all reported discharges of firearms by officers of this Department will be thoroughly investigated by the Firearm Discharge Investigation Team.

The Firearm Discharge Investigation Team has sole responsibility for investigating firearm discharges involving a member of the Department. Failure to cooperate with the investigation shall be grounds for disciplinary action. The foregoing does not prevent an officer from exercising their constitutionally protected rights to remain silent or to speak with legal counsel.

The District Commander of the District wherein a police officer discharges a firearm shall be responsible for assigning a Superior Officer to assist the Firearm Discharge Investigation Team in their investigation into the discharge.

In those incidents where the use of deadly force results in death, the District Attorney's Office, pursuant to the terms of M.G.L. c. 38, § 4, will assume control of the investigation. The statute reads, in part, "The District Attorney or his law enforcement representative shall direct and