control the investigation of the death and shall coordinate the investigation with the office of the chief medical examiner and the police department within whose jurisdiction the death occurred."

In all instances where a Boston police officer discharges a firearm resulting in injury, the District Attorney's Office will be notified and his designees from the Boston Police Department will conduct an independent investigation to determine the facts of the case.

**Responsibilities: Patrol Supervisor**

Shall respond immediately to a reported use of deadly force, Code 303, within his District and assume command of the investigation pending the arrival the District Commander and/or the Firearm Discharge Investigation Team.
Shall notify the Operations Division of the firearm discharge. In turn, the Operations Division shall be responsible for making all necessary notifications.

Shall initiate such preliminary steps as are necessary to conduct a thorough investigation and hold himself in readiness to assist the District Commander and the Firearm Discharge Investigation Team upon their arrival. In this respect, the Patrol Supervisor shall have the authority to order as many units to the scene of the firearms discharge as is deemed necessary or to take any other appropriate action to complete the task.

Shall establish an outside perimeter around the area of the incident.

Shall ensure that the scene is preserved pending the arrival of the Firearm Discharge Investigation Team in a manner pursuant to Rule 309, **Procedures for Handling Physical Evidence and Other Property Coming into Police Custody.**

Shall take possession of the firearm which has been discharged and ensure that it is turned over to the Department Ballistician as soon as possible. **In so doing, the Patrol Supervisor shall preserve all firearms in the condition in which they are found.** The Patrol Supervisor must use extraordinary care in this respect as the firearm may still be loaded.

In the event that more than one officer is present at a shooting incident, the Patrol Supervisor, as soon as circumstances allow, shall collect all firearms which belong to the officers who were at the scene and store them until a Department Ballistician can ascertain which have been fired. Firearms determined not to have been discharged will then be returned to the police officers to whom they were issued as soon as possible.

Responsibilities: District Commander

The District Commander will respond to the scene and assume overall command of the situation pending the arrival of the Firearm Discharge Investigation Team. Additionally, the District Commander will:

Assign a Superior Officer to assist the Firearm Discharge Investigation Team and ensure that any and all District resources are made available to complete the investigation. The District Commander will have the flexibility to assign any Superior Officer to fulfill this task.

Ensure that full cooperation is extended to the Firearm Discharge Investigation Team and any designated investigators from the District Attorney's Office.

Responsibilities: Commander, Homicide Unit

Shall be responsible for ensuring that a Firearm Discharge Investigation Team is assigned to investigate all reported firearm discharges by Department personnel except discharges which occur during Department authorized or approved firearms training, while lawfully engaged in target practice or while hunting (unless a discharge occurring during one of these three exceptions results in death, personal injury or property damage).

The Commander, Homicide Unit shall have the flexibility and discretion to assign any investigators deemed appropriate as being members of the Firearm Discharge Investigation Team.

The Commander, Homicide Unit, shall have ultimate responsibility for ensuring the thoroughness of any investigation regarding a firearm discharge or the use of deadly force by Department personnel.

**Responsibilities: Firearm Discharge Investigation Team**

The Firearm Discharge Investigation Team shall respond to the scene as expeditiously as possible and immediately meet with the Patrol Supervisor and be briefed relative to the known facts surrounding the incident.

Shall notify the Operations Division that they are taking control of the scene and the investigation. Notifications must be done "on-air."

Shall be allowed any resources they deem necessary to conduct a complete investigation.

Shall conduct an investigation to determine the facts of the incident.

Shall ensure that a thorough search is conducted at the scene.

Shall ensure that witnesses are identified, separated and interviewed.

Shall coordinate with any other simultaneous investigations.

Shall submit a preliminary report within five (5) days to the Commander, Homicide Unit, to the Commander of the District or Unit where the officer is assigned and to the Commander of the District or Unit where the discharge occurred, to the Bureau Chief of the appropriate command and to the Superintendent-In-Chief. The Superior Officer in Charge of the Firearm Discharge Investigation Team shall make a recommendation in the preliminary report, based upon an assessment of the facts known, as to the justification for the use of deadly force, whether or not the firearms discharge was accidental **and** whether or not it involved personal injury, death or damage to personal property.

Pending this report, the Officer involved will be assigned to administrative duties in their unit of assignment. However, if the preliminary investigation indicates that the firearm discharge was justified, the Officer may be restored to regular duties, with the approval of their Commanding Officer, the Bureau Chief of the appropriate command, the Superintendent-in-Chief and the concurrence of the Police Commissioner.

The Firearm Discharge Investigation Team shall submit a comprehensive, detailed report, with recommendations, within thirty (30) days to the Commander of the Homicide Unit and to the Superintendent-in-Chief. An extension may be granted to the thirty (30) day time frame with the permission of the Superintendent-In-Chief.

**Sec. 12 Disposition:** Upon receiving a report pertaining to a firearms discharge and investigation by the Firearm Discharge Investigation Team, the Superintendent-in-Chief may accept it or return the report with a request for further information or clarification. In every case, the authority and responsibility for final Departmental disposition of a firearms discharge incident rests solely with the Police Commissioner. Upon accepting a report and making a final disposition in a firearm discharge case, copies of the Police Commissioner's decision shall be sent to the appropriate District, Unit and Bureau Commanders.

Back to Index

## CONTROLLING THE POLICE

Date: September 14, 2002 Page: A12 Section: Editorial

THE **BOSTON Police** Patrolmen's Association's call for the resignation of **Police Commissioner** Paul Evans lacks sense and substance. Evans's ongoing attempt to tighten the department's policy on the use of deadly force deserves support, not reproach.

Evans and a **police** review board have crafted a new policy that would flatly prohibit **police** officers from **shooting** at motor vehicles when the only use of force is the suspect's motor vehicle. Other major **police** departments have adopted a similar policy due to the unacceptable risk that a stray bullet or incapacitated driver might kill or injure innocent bystanders or passengers. That lesson struck home this week in Dorchester when a **police** officer fired at a fleeing vehicle and killed Eveline Barros-Cepeda, a back seat passenger.

The union's misdirected call on Thursday for Evans's resignation is complicated by the fact that he cannot implement the new policy without the permission of the rank and file. In 1997, legislators foolishly passed a bill that stripped **Boston**'s **police commissioner** of his power to override collective bargaining agreements on important public safety functions. That law slowed the pace of **police** reform in **Boston**. Public safety depends on the ability of managers to decentralize **police** functions, deploy officers, and craft important policy changes.

In 2000 Evans implemented a redeployment and retraining of his forces to prepare for anticipated demonstrations at a major biotechnology conference in **Boston**. The **commissioner** used several of his special units rather than district officers. As a result, he quickly became the target of union grievances regarding overtime.

"Now arbitrators are telling me who my tactical teams are," says a disgusted Evans. The **commissioner** says some of his recent efforts to implement antiterror training also prompted union demands to "put it on the main table." It's an absurd and dangerous situation. **Police** managers, not legislators or labor relations specialists, should be running the **Police** Department.

Evans is on the right track here. He deserves more visible support from Mayor Thomas Menino.

Some patrolmen argue that no one has the credibility to comment on the use of deadly force unless he or she is on the street answering **police** calls. But important **police** work also takes place inside Schroeder Plaza, where the department's research arm has been analyzing every intentional firearms discharge by a **Boston** officer since 1990. In 34 of 98 discharges, a motor vehicle was the only "weapon" shown, raising serious questions about the wisdom of firing rather than redeploying for a later arrest. This year, three of the four fatal **shootings** by **police** officers involved motor vehicles. In both previous cases, the suspects had no firearms.

The policy change is a lifeline to officers, suspects, and bystanders. The **police** union, blinded by bitterness, has tripped over it.

THIS STORY HAS BEEN FORMATTED FOR EASY PRINTING

| EVANS VOWS TO PUSH PLAN ON GUN USE BY OFFICERS **Author(s):** John Ellement, Globe Staff **Date:** September 14, 2002 **Page:** B5 **Section:** Metro/Region **Boston Police Commissioner** Paul F. Evans yesterday rejected a union demand that he resign, and instead vowed to push ahead with his plan to ban **police** from **shooting** at moving vehicles, a proposal he insisted would safeguard the lives of the officers he commands. "This is about, first and foremost, officer safety," Evans said of the proposed revision of the department's deadly force rules begun in reaction to the fatal **shooting** of eight people by **Boston police** officers in the past 22 months. "We are saying to the officers, `Don't put yourself in a position where you can become a victim.' " But leaders of the **Boston Police** Patrolmen's Association said in interviews yesterday that Evans should step down because his proposed ban effectively disarms **police** and will some day cost a **police** officer his or her life. "It's not if, it's when," union president Thomas J. Nee said. "It's inevitable." Evans announced his proposal Monday, one day after a 25-year-old Dorchester woman was fatally shot by Officer Thomas Taylor Jr. as he tried to stop a car that allegedly had just struck his partner, Officer Michael Paillant, on a Dorchester street. The **shooting** has prompted community activists to renew demands for civilian review of the **Police** Department, and yesterday, the NAACP's **Boston** branch also called on US Attorney Michael J. Sullivan and the US Justice Department's Civil Rights Division to conduct an independent investigation into the **shooting** and a review of all cases in the past two years in which city **police** used deadly force. "The process that currently exists to ensure that fatal **shootings** are investigated properly and prosecuted to the fullest extent of the law has failed. The community partnership and trust has been fractured and is in serious trouble," branch president Leonard C. Alkins said in a statement. A spokeswoman has said Sullivan will not comment. Union official James Carnell said the widely publicized proposed revision has alerted criminals that they can freely attack **police** with their cars. "To set a policy that somehow we should never, ever defend ourselves when we've been attacked with a 2,500-pound weapon, just immediately sends a message to the criminal element to drive your car at the cop," said Carnell. "To me that makes no sense." Although Evans and union officials sharply disagree on the proposed rule, which would allow officers to discharge their weapons only if they are being fired upon, both sides said **shooting** at a moving vehicle to stop it works only in Hollywood movies, not in real life. Union officials are particularly rankled that Evans disclosed the proposed revision the day after Eveline Barros-Cepeda was fatally shot while riding in the back seat of a Ford Taurus that struck Paillant as he tried to help other officers who were pursuing the car after it ran a red light in Uphams Corner. They said that, just 48 hours after Evans outlined his plan, a **Boston police** officer chose not to shoot at a man who allegedly was driving a truck wildly through Roxbury. The man allegedly struck Officer Andrew Miskell, crashed the truck, then carjacked a motorist

nearby. **Police** eventually arrested the man at gunpoint on McGreevey Way Wednesday afternoon after a struggle. "I visited that officer in the hospital while his girlfriend was crying over him," said BPPA secretary Officer Robert Boyle. "He said, 'I didn't shoot because I thought I'd be in trouble.' " The union officials said **police** will become "gun-shy," and hesitate to take aggressive action even when public safety demands it of them. They also said that another section of the proposed deadly-force rule, which narrows the circumstances under which officers can point their weapons at suspects, would level the playing field between officer and suspect, taking away the tactical advantage **police** historically enjoyed by having a handgun. But Evans countered that, when he sharply restricted the circumstances under which **police** may engage in high-speed chases through **Boston**'s streets, the union had warned then that criminals would run rampant through the city. That hasn't happened, he said. He also said Miskell escaped with minor injuries because the officer did not engage the suspect. "Miskell is alive because he jumped out of the way," Evans said. "If he stood his ground and fired, and the truck continued, he would be dead today." Evans said the BPPA's challenge to his proposal grows out of the "very contentious" relationship he has had with the department's largest union during his nearly nine years as **commissioner**. "Let's cut out the baloney, and let's cut to the chase," he said. "They've not been happy with some of the things I've proposed." Evans cited tougher disciplinary standards, taking officers out of stations and putting them on the street, and mandatory drug testing as some of the issues that separate him from the union's leadership. The BPPA is the only union of the three in the department to seek Evans's removal. The **Boston Police** Detectives Benevolent Society said it would not call for Evans's ouster, and the head of the **Boston Police** Superior Officers Federation, which represents uniformed sergeants, lieutenants, and captains, declined to discuss his union's views. "I'm not going to comment on it," said president Joseph Gillespie. Nee said the BPPA will push ahead anyway. He also said that although the wording of the proposed deadly-force rule can be changed in contract talks, his union cannot block Evans from implementing it if he chooses. |                    | © 2003 New York Times Company

THIS STORY HAS BEEN FORMATTED FOR EASY PRINTING

| | | UNION CALLS FOR EVANS TO STEP DOWN
**Author(s):** John Ellement, Globe Staff, and Jenny Jiang, Globe Correspondent **Date:** September 13, 2002 **Page:** B1 **Section:** Metro/Region  The **Boston Police** Patrolmen's Association yesterday called for **Police Commissioner** Paul F. Evans to resign, saying Evans's planned restrictions on the use of deadly force - outlined after the fourth fatal **police shooting** this year - are "deadly and irresponsible" and could lead to "officers killed in the line of duty." In a statement posted on its Web site, the union said Evans is "unfit to lead this department" because he wants to ban officers from **shooting** at moving vehicles. Evans announced the changes on Monday, a day after an officer shot at a fleeing car and killed a 25-year-old Dorchester woman riding in the back seat. Despite the turbulent, often bitter relationship between Evans and the BPPA, the statement is the first time the union has asked him to step down since he became **commissioner** in 1994. BPPA president Thomas Nee could not be reached for additional comment last night. Meanwhile yesterday, City Councilman Chuck Turner and activist Sadiki Kambon called for a federal investigation into the **shooting** of Eveline Barros-Cepeda and the seven other victims who were fatally shot by on-duty officers in the last 22 months. Friends and relatives of Barros-Cepeda led 300 people in a somber march through the Uphams Corner section of Dorchester to Quincy Street, where the **police** pursuit ended in gunfire early Sunday morning. Barros-Cepeda, also known as Angela, died when the driver, allegedly fleeing **police**, allegedly tried to run over Officer Michael Paillat, who attempted to stop the car on Dunkeld Street. His partner, Officer Thomas Taylor Jr., fired five shots at the car as it sped away, according to authorities. She leaves a 2-year-old son, Nazee. The marchers wore purple ribbons, held candles, and carried signs painted by Barros-Cepeda's family as they weaved through narrow streets, where some residents watched the procession from front porches. The song, "Angel," was blaring from a green sport utility vehicle leading the group. As the march reached Barros-Cepeda's home on Wayland Street, several relatives sobbed in clusters outside. The marchers continued to the place where Barros-Cepeda died. "This is for you, Angela," her cousin, Antonio Nunes, said of the march. "This is only the beginning. Only the beginning. I want to let the city know, the **Boston police** know that the family was able and capable of having a peaceful march. No violence. No violence. We must stop the violence." Kambon and Turner said that Evans and Mayor Thomas M. Menino have repeatedly ignored calls to rewrite the deadly-force rules, using input from city residents, and they asked US Attorney Michael J. Sullivan to step in. Turner said he wants Sullivan to review the department's rules, equipment, and training, and then recommend needed changes. He also said Sullivan should consider bringing criminal civil rights violation charges against the officers involved in the recent **shootings**. Turner applauded Evans for trying to overhaul the deadly-force rules, but acknowledged that the union may be a stumbling block to getting it done quickly. But Menino, he added, needs to

"sit down with the leadership of the community to look at how we can work together to try to end this tragic situation." Kambon also blamed the mayor for a "lack of leadership" and said Evans should resign if he can't revamp the regulations. Eight fatal **police shootings** in 22 months, he added, puts **Boston** at "the top of the heap" among departments nationwide. Carole Brennan, Menino's spokeswoman, said yesterday that the mayor supports Evans "100 percent" and added that both Evans and Menino are getting input from the community. Yesterday's statement marks a low point between the **commissioner** and the largest of the three unions in the department. Evans and the BPPA have repeatedly tangled over disciplinary matters and work rules at the bargaining table, before the state Labor Relations Commission, and in the courts. **Boston police** spokesman Mariellen Burns said Evans has no intention of resigning and brushed aside the BPPA's statement. "We're not even going to dignify that with a comment," she said. Still, the BPPA statement said the union will spend the next three days drawing up a plan to block Evans's proposal on deadly force. The BPPA also called on the detectives' union and the superior officers' union to stand "shoulder to shoulder" with them. When asked whether his union will back the BPPA, Tommy Montgomery, president of the **Boston Police** Detectives Benevolent Society, answered: "Absolutely not." Though some detectives fear Evans's move will encourage the "bad guys" to use cars as weapons, Montgomery said his union will resolve the issue at the bargaining table. A spokesman for the **Boston Police** Superior Officers Federation could not be reached for comment yesterday. A spokeswoman for Sullivan, Samantha Martin, said Sullivan would not comment. Nunes said last night that the family will not comment on the investigation into the fatal **shooting**. "Nothing has come out, so I can't comment on anything," Nunes said. "I trust the **Boston police** are going to do a great investigation. I'm going to leave it at that." | | © 2003 New York Times Company

About your archives purchase: Your purchase of 3 articles expires on 08/09/2003 08:06:03. You have viewed 1 articles and have 2 articles remaining.

| MAN HELD AS DRIVER AT FATAL SHOOTING **Author(s):** Francie Latour, and Douglas Belkin, Globe Staff **Date:** September 10, 2002 **Page:** B1 **Section:** Metro/Region  Under intense pressure and scrutiny from city leaders and the family of a young Dorchester mother killed by shots fired by one of its officers, the **Boston Police** Department yesterday arrested a 23-year-old man **police** say was driving the car carrying the woman when she was shot. Department officials also laid out new rules to beef up training and possibly bar officers from **shooting** at moving cars.  The man, Brima Wurie of Dorchester, will be arraigned this morning in Dorchester District Court on a charge of assault and battery with a dangerous weapon. **Police** say Wurie was behind the wheel of the white Ford Taurus that carried Eveline Barros-Cepeda, her cousin, and two other passengers. **Police** say the driver sped through a red light, refused to stop for **police**, and later hit an officer during a pursuit early Sunday.  After Wurie struck the officer, **police** said, the officer's partner opened fire, pumping five rounds into the rear of the

fleeing vehicle. Flanked by two other passengers in the back seat, Barros-Cepeda, 25 and the mother of a 2-year-old son, was hit by two bullets. She was the fourth person this year to die in a **shooting** by a **Boston police** officer and the eighth to die at the hands of a **Boston police** officer in the past 22 months. **Police** officials last night identified the officer who fired the shots as Thomas Taylor Jr., 35, a patrol officer and a nine-year veteran from Roslindale. His partner, Michael Paillant, 31, of Hyde Park is also a patrol officer, with seven years on the job. **Police** said Paillant went over the hood of the car when it struck him. He was released from the hospital Sunday after being treated for leg injuries. A spokeswoman for the department, Mariellen Burns, said that she did not know the extent of Paillant's injuries, but that no bones were broken in the incident. Thomas Drechsler, a lawyer representing the **Boston Police** Patrolmen's Association, argued yesterday that Paillant's life was still in danger after the car struck him, justifying the **shooting** by Taylor. Clergy and other city leaders, including members of the Ten Point Coalition, voiced concern about the **shooting**, saying it demands an immediate response and a reexamination of the training that prepares officers for the use of deadly force. At a press conference yesterday, Deputy Superintendent Paul J. Farrahar said information **police** obtained late Sunday led them to Wurie, who was arrested at the office of his parole officer. A **police** official, who asked not to be identified, said Wurie was linked to one of several feuding Cape Verdean gangs and was released last month from the South Bay House of Correction. In the past several years, the official said, Wurie has been the target of several **shootings**. As recently as Saturday, the department's gang unit, the Youth Violence Strike Force, was looking for Wurie on the suspicion he was carrying a gun, according to the official. As **police** announced Wurie's arrest, **Commissioner** Paul F. Evans sent a letter to **police** unions announcing a proposed change that promises to be controversial: a rule that would bar officers from **shooting** at moving vehicles. Currently, department policy instructs officers to move out of the way of oncoming vehicles and refrain from **shooting** at them unless the officer has no other means of escape and is in imminent danger. The policy, instituted in August 2000, was designed to discourage officers from firing at moving cars. But critics have called the policy unclear, saying it has led to a lack of accountability and mounting community tension following a series of fatal **police shootings** involving moving vehicles. Three of the four fatal **shootings** by **Boston police** this year involved moving vehicles. Of the 98 **shooting** incidents by **Boston** officers between 1990 and 2002, fatal and nonfatal, 40 have involved moving cars, Evans said. The proposed rule would prohibit **shooting** at any moving vehicle when the vehicle is the only use of force, Evans said, even if the car is being used as a weapon against the officer. In all three of this year's fatal **shootings** involving moving cars, the car was the only element of force used by the suspect. Evans said several cities - including Philadelphia, Chicago, St. Louis, and Cincinnati - already follow such a guideline. "It prohibits firing at motor vehicles, period," Evans said. "The ability of a bullet to stop a car we question." Evans defended the department's record, saying that "**Boston** has a history of low discharges of firearms, low use of deadly force, low numbers of fatalities." But he acknowledged the series of **shootings** in the past 22 months. "That's what we're concerned about right now," he said. Evans said he was also beefing up training in the use of deadly force for new officers and for veterans required to attend routine in-house training. The new training standards, which go into effect immediately, will lengthen the twice-annual

in-house training time from a few hours to an entire day, emphasizing decision-making and split-second judgments. Leaders of the department's unions and their lawyer responded with outrage at the proposed changes. The department cannot implement the changes without the agreement of the unions. "If a moving car is putting a person in danger, he's encouraging the person to die or to allow people to be killed," Drechsler said. He questioned the timing of Evans's announcement and called it a "panicked response" to Sunday's **shooting**. Thomas Nee, president of the patrolmen's union, said, "Officers are out there risking their lives, and Evans is second-guessing them. . . . The officers are being interviewed and debriefed. Let it run its course." Evans insisted yesterday that his actions were not solely a response to Sunday's **shooting**. He said they sprang from the ongoing work of a review board he appointed last year to examine the increase in fatal **shootings** by officers. Responding to the **commissioner**'s actions last night, Rev. Ray Hammond of the Ten Point Coalition said he hoped that the unions would work with Evans to implement the proposed changes. But he said the **shooting** still requires an immediate explanation by **police** officials, once investigators determine the facts of the latest **shooting**. "Even if his life was still in jeopardy," Hammond said, referring to Paillant, "**shooting** through the back of the car is still not appropriate. **Shooting** through the back window is not going to resolve that situation." |

**Techical problems**: If you have a technical problem with your account please contact Newsbank at 1-800-896-5587 or by e-mail at                      . Return to the          of The Boston Globe Online ©           2003 New York Times Company

# POLICE BEING SUED BY VICTIM SHOT IN CAR CHASE

**Author(s):** Peter Schworm, GLOBE STAFF CORRESPONDENT **Date:** September 26, 2002
**Page:** 1 **Section:** Globe West

On a snowy February night two years ago, Louis Pimentel was a passenger in a van that led **police** on a high-speed chase from Hudson to Shrewsbury. The driver, Dominic Agostinho, whose license had been revoked, fled officers' attempts to pull him over for a faulty headlight, and in attempting to escape tried to run down several officers.

The officers responded by firing numerous shots at the van, wounding both men. Agostinho later pleaded guilty to a range of charges and was sentenced to four to five years in prison. Now Pimentel, who was unarmed and was not charged with a crime, is suing the Hudson and Marlborough **police** departments in federal court for using excessive force.

Pimentel, a 37-year-old who lives in Hudson, accuses four **police** officers - and the department chiefs who supervised them - of violating his civil rights by firing at the van. Pimentel was unarmed and attempting to surrender to authorities when he was shot in his shoulder, chest, leg, and foot, according to his lawyer, Jessica Hedges of Hrones & Garrity. Pimentel's conduct gave **police** no just cause to open fire, she said.

"Given the fact that our client clearly had his hands up and was waiting for the officers to give an exit command, the **shooting** was an exaggerated response," she said. "It appears the policy of the **police** is to shoot first and ask questions later."

The suit, filed in US District Court last month, also claims that Hudson **Police** Chief Richard Braga Jr. and Marlborough **Police** Chief Mark Leonard are liable for "tolerating a custom and practice in which subordinate officers use excessive force" and tolerate "deliberate indifference to the rights of its citizens."

Braga said the officers fired at the van only when it accelerated toward them, placing their safety at risk.

"There were no findings of any wrong-doing," Braga said. "It's my belief the officers did what they should, given the situation. If the lives of **police** officers are in danger, they are allowed to exercise deadly force."

Department policy regarding **shooting** at moving vehicles has not changed, Braga said. Leonard declined to comment while the matter is before the courts. But Marlborough city solicitor James Golden said the decision to fire at the vehicle was justified because the situation posed a danger to **police** safety. When **police** fired on the van, one officer had already been injured in the chase. The van had hit **police** cruisers and tried to run over several other officers, he said.

In a subsequent departmental review, Marlborough officers Kenneth McKenzie and Stephen Lupien were found to have responded appropriately and received no reprimand, Golden said.

"At that particular point of time, the vehicle was still a threat," he said. "The officers acted within the scope of the policy that was in effect at the time."

Marlborough's policy involving firing at fleeing cars that pose a threat to their lives or others' has not changed, Golden said.

In **Boston**, an officer's fatal **shooting** of a passenger in a fleeing car Sept. 8 prompted **Police Commissioner** Paul Evans to propose banning **police** from **shooting** at moving

vehicles. Opposing the move, **Boston**'s largest **police** union issued a no-confidence vote in the **commissioner**.

But Golden said the **Boston** and Marlborough situations are not comparable.

"They are not the same circumstances at all," he said.

Hedges said that Pimentel repeatedly urged the driver to pull over and that he tried to surrender at one point when the van was cornered and at a standstill. He again raised his hands to show he was unarmed when the car was stalled on a snowy median, Hedges said. When the car broke free, **police** shot into the passenger-side windows and doors, wounding both men.

"The whole time, he was yelling `Stop, stop, stop,' " Hedges said. "He clearly had his hands up, but was still shot at close range."

Golden noted that the van eventually broke away from the **police**. A short time later, Pimentel jumped from the moving vehicle into the breakdown lane, where **police** picked him up and took him to the hospital.

In June 2001, Agostinho pleaded guilty to charges of assault and battery with a dangerous weapon, five counts of assault with a dangerous weapon, and six counts of armed assault with intent to murder. He received a four- to five-year sentence.

Pimentel, who is seeking compensatory and punitive damages, recovered fully from his wounds but was traumatized by the episode, Hedges said. A construction worker, he was out of work for more than six months, she said.

Exhibit 5

April 27, 2004

**Fee Due**

RECEIVED
CITY CLERK'S OFFICE
2004 APR 29 PM 2:26
BOSTON, MA

Mayor's Office
Mayor Thomas M. Menino
1 City Hall Plaza
Boston, MA 02201

Dear Mayor Menino:

Please be advised that this is a c.258 demand letter pursuant to the Massachusetts Torts Claim Act, M.G.L.c.258 and I intend to file a lawsuit for negligence and intentional tort.

On May 10th, 2002 at approximately 9 pm, I was sitting in the drivers seat on a Buick Rendezvous, which was at the time this act of negligence occurred I was not moving I was not moving when Joseph King shot me in the back of my head. He's an on-duty Boston Police officer employed by the City of Boston with his department issued 40-caliber Glock handgun. I was unarmed at the time of the shooting and posed no risk to anyone.

The shooting was totally unjustified and clearly an act of negligence. David Anderson was a witness to this event. In a statement given to the Boston Police (see attached exhibit 1) confirmed that officer King had indeed shot me while I was in the vehicle and that the vehicle was stopped at the time of the shooting.

I have suffered from and continue to suffer many physical, neurological, and psychological impairments due to this act of negligence including but not limited to: hearing loss, visual impairment, constant headaches, post traumatic stress disorder, continues hand tremor likely due to brain damage, constant pain from bullet fragments that remain in my head, and a large unsightly scar on the back of my head. I have also previously worked in the film industry and the scar may prevent me form getting some or most jobs.

Wherefore, I am demanding payment of $100,000 U.S. currency for compensation for my medical and legal costs incurred past and future due to the act of sole count of "negligence" and further demand $100,000 for the sole count of "negligence" for inflicting emotional distress of Joseph King, a Boston Police officer employed by the City of Boston pursuant to M.G.L. c. 258.

Sincerely,

Robert Beckley
277 Concord Road
Bedford, MA 01730

Mailed check # 3564 on 5/12/04

**CITY OF BOSTON
OFFICE OF THE CITY CLERK
ROOM 601, CITY HALL**

In accordance with the provisions of Chapter 13 of the Ordinances of 1981, effective August 1, 1981, the filing of all claims against the city or demands for compensation, (excluding claims of indemnification for employees and retired employees), must be accompanied by the payment of a $5.00 fee. Said fee to be made part of the compensation if a decision is rendered on behalf of the claimant.

The claim you recently filed with this office was not accompanied by the $5.00 fee and accordingly, we will be unable to begin to process the claim until such time as payment is received.

In order to assure prompt consideration of your claim, please remit the fee, payable to the City of Boston, as soon as possible.



```
FISERV-BOSTON (AGENT)
053772157  05-19-04
053772157  3000 3004 01
```

CERTIFICATE OF SERVICE

I, Karen Beckley, hereby certify that I served **DEFENDANTS CITY OF BOSTON, BOSTON MAYOR THOMAS MENINO, BOSTON POLICE DEPARTMENT, CITY OF BOSTON PAST MASSACHUSETTS POLICE COMMISSIONER PAUL EVANS, PRESENT MASSACHUSETTS POLICE COMMISSIONER KATHLEEN O'TOOLE, AND BOSTON POLICE OFFICER JOSEPH KING ROBERT BECKLEY'S PRO SE MOTION FOR 3RD AMENDED COMPLAINT**, by postage prepaid, first class mail, upon the following counsel of record on May 7, 2005.

Amy E. Ambarik, Esq.
Helen Litsas, Esq.
City of Boston Law Department
Room 615, Boston City Hall
1 City Hall Plaza
Boston, MA 02201

Kenneth H. Anderson, Esq.
Finneran, Byrne & Drechsler
Easter Harbor Office Park
50 Redfield Street, Suite 201
Boston, MA 02122

Walter B. Prince Esq.
Kristin M. Knuuttila Esq.
Prince, Lobel, Glovsky & Tye LLP
585 Commercial Street
Boston, MA 02109

*/s/ Karen Beckley*
Robert David Beckley, Pro se
c/o Karen Beckley
277 Concord Rd.
Bedford, MA 01730